**Cordie Mae PAYLOR, Appellant,**

**v.**

**UNITED STATES of America,**
**Appellee.**

**No. 21414.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 11, 1968.

Decided Sept. 25, 1968.

Fahy, Senior Circuit Judge, dissented.

Mr. John T. Koehler, Washington, D. C. (appointed by this court) for appellant.

Mr. Daniel J. Givelber, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before FAHY, Senior Circuit Judge, and BURGER and TAMM, Circuit Judges.

PER CURIAM:

Appellant, Cordie Mae Paylor, was tried and convicted of the crime of manslaughter and sentenced to a term of one to five years. It is from that verdict and judgment she appeals.

At about six o'clock in the evening of January 8, 1966, the appellant and her common-law husband, the deceased, arrived at the home of Mr. and Mrs. Roland Smith, the appellant's brother-in-law and sister. Upon entering, there was some conversation and drinking before dinner. After eating, Mr. Smith went into the bedroom to rest. The deceased, James Arthur Pearce, and the appellant then began to argue over the issue of which of them was to pay a furniture bill. The deceased struck the defendant as she attempted to get a drink of water and a tussle ensued. Thereupon the deceased was stabbed in the chest with a knife taken from the stove. During the struggle, Mrs. Smith ran to get her husband to break up the fight and upon re-entering the room she saw appellant with the knife in her hand. The deceased's shirt was bloody. Mr. Pearce died later that evening, the cause of death being a stab wound in the pulmonary artery.

Mrs. Smith was the Government's main witness. She testified on direct examination that the deceased " * * * follow-

ed her (the defendant) and grabbed her by the neck, around the neck and I seen (sic) he was choking her. * * * " At this point the prosecution, at the bench, claimed surprise, based upon a statement of the witness given to the police shortly after the incident and also upon an interview of the witness prior to coming into court. The trial judge advised the prosecutor to show the witness her statement with the hope of refreshing her recollection. After reading the statement (which makes no mention of the fact that Mr. Pearce choked the defendant) the witness again testified that the deceased choked Mrs. Paylor. Again a bench conference was requested and the court permitted the prosecutor to cross-examine the witness as to "material discrepancies" between what was being said from the stand and what she told the detective on January 8, 1966.

During cross-examination the witness admitted that what she told the police was incorrect because she was "rushed" and "under the influence of alcohol too." Again a bench conference was called and the trial judge expressed concern over the inconsistencies and agreed with counsel that if permitted to continue in this manner, the witness might very well "hang" the defendant.

With this in mind and with the consent of both counsel, the jury was excused and the witness admonished that it was the business of the court to uncover the truth and that lying could only "dig a hole for the defendant." Further that it was what the witness herself remembered and not what someone had told her that concerned the court. The trial judge went on to specifically point out to the witness that it was important to tell only what she saw and to refrain from supplying that which she did not see, and that to tell the assistant United States' Attorney that her statement to the police was untrue, if it was in fact true, would harm her sister. Finally, the trial judge attempted to make it clear that he did not want her to say any prior statement was false unless it was, in fact, not true.

■ In considering whether these instructions, in the light of the circumstances surrounding them, amounted to error, we conclude that they were designed to elicit from the witness the truth of the occurrence and were not an attempt to coerce the witness into abandoning her present testimony. Further, with reference to the words of the trial judge in intimating that the witness might "hang" the defendant, we conclude that he spoke with respect to the inconsistencies of the testimony and not with respect to the issue relating to self-defense.

It is unfortunate that the trial judge used the words "hang the defendant" and that it might well be that they were misunderstood by the witness. However, it is clear that upon resuming the stand, before the jury, the witness testified that it was her present recollection that her statement to the police, one and a half hours after the incident, was correct and that her statement from the stand concerning the choking of the defendant was incorrect. This testimony seems to arise out of an attempt on the part of the witness to act in accordance with the instructions of the trial judge to tell the truth and not out of a fear of coercion on the part of the court or prosecutor.

Having considered this question we feel that there was no manifest error on the part of the trial judge which worked to the prejudice of the substantial rights of the defendant.

■ There is another approach to our review of this proceeding which we believe also justifies and requires affirmation of the trial court. Inherent in the trial of every criminal case is the existence of a broad area wherein the trial judge is required to exercise his discretion to assure that the ultimate outcome of each case is fair both to the defendant and to the prosecution. "The goal of a criminal trial is the disposition of the charge in accordance with the truth." Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965). The experienced and knowledgeable trial judge in this case was, we believe, properly acting within the area reserved to his discretion

when he undertook to emphasize to this witness the imperative importance of her truthful testimony. "The experienced trial judge has a sensitivity in this regard which normally can be relied upon to strike a reasonable balance between the interests of the defendant and the public. * * * The matter is, we reiterate, one for the exercise of discretion; and, as is generally in accord with sound judicial administration, that discretion is to be accorded a respect appropriately reflective of the inescapable remoteness of appellate review." Luck v. United States, supra at 769. While we were in *Luck* referring to the exercise of discretion with reference to another trial problem, we feel our above quoted statements are equally applicable to the present case.

We have also considered the other points raised on this appeal and conclude that there was ample evidence to submit the question of guilt or innocence to the jury. They chose the former. We do not disturb their choice.

Affirmed.

FAHY, Senior Circuit Judge (dissenting):

Appellant was the common law wife of James Arthur ("Billie") Pearce. One evening they were in the kitchen of the small apartment of appellant's sister and the sister's husband. Pearce had been drinking. An argument arose between him and his wife, the appellant. He struck her in the face, knocking her against the wall. A struggle between them ensued, during which appellant secured a knife from the kitchen table near where they were struggling. Pearce was stabbed and died.[1] His wife was indicted for manslaughter and convicted. She appeals, contending primarily that the evidence failed to establish a crime on her part and that, therefore, her motions for a directed verdict of acquittal should have been granted. While I do not agree with this contention it is clear to me she is entitled to a new trial because on the

critical issue of self-defense the testimony of an important witness was unduly influenced by the respected trial judge, as now to be explained.

The witness referred to is Mrs. Evelyn Smith, then the 23 year old sister of appellant. She was called by the prosecution. She testified deceased knocked the appellant, his wife, against the wall of the kitchen and then began choking her. Her direct examination by the government elicited further:

Q. And you actually saw him choking her? A. Yes, I did.

Q. And then you went to get Roland? Is that right? A. Yes Sir, that is right.

The government claimed surprise due to a statement this witness had given the police at the Homicide Squad the evening of the fight, 17 months prior to the trial. While she did not mention choking in the statement, she did state the deceased "knocked" appellant against the wall and "hit her," that the knife was lying on an adjacent table, that the witness then went to her bedroom to get her husband, and when she returned, "they [the deceased and the defendant] were fighting over by the door to the hallway."

At the court's suggestion the witness was permitted to refresh her recollection by reading the statement. She reiterated her testimony of the choking, saying that deceased struck appellant, "grabbed her behind the neck" and "started choking her from * * * behind," and that "she turned around and he started choking her from the front." She said she then went to get her husband. She was asked "And when you came out of there who had the knife in his hand?" She answered again, "Billie." "Q. Billie? A. Yes Sir."

The foregoing was not inconsistent with her statement to the police. The Assistant United States Attorney, however, again protested to the court, emphasizing that the witness had testified

[1.] The only direct testimony as to how the wound was inflicted is set forth at note 3, *infra*.

deceased choked appellant. The court, apparently referring to the witness' statement to the police, pointed out to the prosecutor that she had not said anything about the deceased's choking appellant. The witness then testified that at the time she gave the statement she was under the influence of alcohol, that the police were "rushing" her and told her she "had to give a statement," and that she was "scared and upset [and] just went ahead and gave it to them." She said she remembered better now. On being asked if she had talked to her sister about what happened she said she had.

There was a lengthy bench conference. The court agreed with counsel for the government that if the witness continued the same way, quite evidently meaning that if she insisted that deceased choked defendant, she was "going to hang the defendant."

Why this testimony favorable to appellant would "hang" her—that is, convict her—is not understandable. Of course it was open to the prosecution to examine, perhaps even to cross-examine, its own witness as to why the choking was not mentioned in the earlier statement and to urge upon the jury that since the choking was not then mentioned it did not occur. But this was not the course adopted. Convinced no doubt that, because the earlier statement had not mentioned choking although it did mention fighting which might well have included choking, the witness was not telling the truth the trial judge gave her a long lecture about the good intentions of the prosecution and the need for her to tell only what happened, implied she had been told by appellant to add the choking detail, and repeatedly indicated to her that he did not believe she was telling the truth and that, therefore, to use his phrase at one point, "you are harming her," adding, "digging a hole for her. Now I do not want you to say it is false but certainly I do want you to say it is false if it is not true."

The lecture to the witness was no mere reminder of her oath and that she should tell the truth. It covers five typewritten pages of the transcript. It was a persuasive indication to the witness that the court did not accept her prior testimony as the truth and that any subsequent testimony would be believed only if it differed from her previous testimony.

It must be remembered that this protracted discussion grew out of the efforts of the government to eliminate the testimony of the choking on the ground that it was a surprise to the prosecution since it was not included in—although not inconsistent with—the witness' statement to the police after the alleged crime. In continuing his admonition to the witness the trial judge stated:

"You think about that during the recess you did not come down here to hurt your sister, did you?

THE WITNESS: No Sir.

THE COURT: Well I will tell you one thing the surest way to hurt her is to lie.

MR. WILLIAMS [Defendant's attorney]: Just read that during the luncheon recess. Come back in here and sit down and then tell what happened, what is the honest to goodness truth. Don't talk to Cordie [d]uring the luncheon recess. Okay. Nobody is hurt yet."

When the witness resumed the stand in the afternoon she readily complied with what she was obliged to understand the court desired. She was asked whether when she testified before luncheon she was perhaps a little nervous. She said she was, she had never testified in court before; that she was separated from her husband and living with her sister; that she had looked over the statement and tried to remember what happened. Being asked whether, now that she was less nervous and had looked things over, she could say now that the statement she gave to the police January 1966 was correct, she said, "Yes Sir." And in answer to whether some of the things she told before were incorrect she said, "That is right," she did not see him choking her.

It is quite apparent that this witness was unduly persuaded by the learned judge, with cooperation of the prosecutor and to some degree with the acquiescence of defense counsel, to abandon her testimony that the deceased had choked appellant.

If the choking occurred it was very material on the issue of self defense, and her testimony that it occurred was in no way inconsistent with her statement to the police.[2] It was quite consistent with her statement that they were fighting. That the fighting included choking was believable when it is undisputed the deceased had just knocked his wife against the wall. If not choking, what was the fighting? There was no suggestion in all the lecturing of the witness that she amplify the nature of the "fighting" referred to in the statement. Any omission in the statement to spell out the fighting by saying deceased was choking appellant did not justify an effort on the part of the court to lead the witness to change her testimony on the theory, advanced by government counsel and accepted by the court, that this testimony, which was favorable to the defense, would "hang" the defendant. In this connection, the court also said to the witness:

Insofar as we are concerned your efforts to help your sister might very well hang her. So you are called upon to tell the truth to the questions the Government counsel here is asking you. [He] is asking you what happened that night. He is not trying to hang your sister. He is trying to get what we call justice in the Court Room.

The justice which the prosecuting attorney was seeking was a verdict of guilty of manslaughter.[3] There was a serious question whether this was the justice of the case rather than, for example, a verdict of not guilty by reason of self-defense.[4]

The issue of falsity or truth was for the jury to consider by comparing her testimony with her prior statement, given when she was in a partially intoxicated condition. It was not the province of the judge to urge her to admit before the jury that the choking to which she had testified did not occur, and that unless she did so admit she would convict her sister. *Cf.* Quercia v. United States, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321.

The truth about the fighting is not clear. I am convinced, however, that this witness should not have been pressed by the judge to adhere, without amplification in this respect, to her statement to

---

2. Indeed, earlier in this exchange, the trial judge noted that "her discrepancy is one of omission, not [one] of inclusion."

3. The only direct testimony as to how the stab wound was inflicted was that of appellant herself. She said deceased struck her in the face and grabbed her by the back of the neck, that she went to get the knife near the stove, picked it up, and he began to choke her. She described the immediately following events in this manner:

A. I had the knife in my right hand. He had his right hand around my neck and when I turned around his hand slipped under my neck and he was choking me. So he was choking me and I didn't know what to do and I thought he was going to kill me so I turned around to raise my hand with the knife and he grabbed my wrist and when he grabbed my wrist.

* * * * *

Q. He had your wrist in his left hand? A. Right.

Q. And you had the knife in your right hand? A. Right.

* * * * *

A. We tussled with the knife and then we tussled with the knife and then he let go of my wrist but he was still choking me, holding his hand on my neck so when he let go of my wrist the knife went forward and struck him in his arm. [Apparently appellant was mistaken as to the position of the stab wound.]

4. There was testimony of previous instances in which deceased had threatened appellant with a gun and knocked her down steps when she was pregnant, and of their fighting and arguing, he knocking her down and threatening to kill her.

the police, especially as the choking testimony had to do solely with an omission from rather than a contradiction of anything in that statement.[5]

I respectfully dissent.

---

5. The statements in Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763, referred to in the majority opinion, were with respect to the discretion of the trial court in the admission or exclusion of evidence impeaching a defendant, based on his prior conviction, a matter quite remote from the present problem.