**UNITED STATES of America, Appellee,**

v.

**Eric Von WILLIAMS, Appellant.**

**No. 95–3173.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 10, 1997.

Decided May 20, 1997.

Rehearing Denied July 23, 1997.

Lisa B. Wright, Assistant Federal Public Defender, argued the cause, for appellant, with whom A.J. Kramer, Federal Public Defender, was on the briefs. Neil H. Jaffee, Assistant Federal Public Defender, Washington, DC, entered an appearance.

Marian L. Borum, Assistant United States Attorney, argued the cause, for appellee, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher, Thomas J. Tourish, Jr. and Jennifer M. Anderson, Assistant United States Attorneys, were on the brief. John R. Fisher, Washington, DC, entered an appearance.

Before SILBERMAN, WILLIAMS, and HENDERSON, Circuit Judges.

SILBERMAN, Circuit Judge:

Eric Von Williams was convicted of two counts of distribution of cocaine base and two counts of unlawful use of a communication facility. His appeal focuses on various alleged errors at trial, including the denial of a missing witness instruction, a reference to a prior arrest photograph, bad character remarks by the prosecutor, and improper questioning of Williams by the trial judge. We affirm.

## I.

The government established that Williams sold crack cocaine on three different occasions in one month to undercover DEA agents. The first sale (with which Williams was not charged because it took place in Maryland) was arranged through an individual known as Maurice, who was cooperating with the DEA to reduce a sentence he was facing; Maurice was the initial link between the DEA and Williams. To set up the two sales with which Williams was ultimately charged, the DEA agent who had made the first purchase (Engram) contacted Williams directly through the pager number that Williams had given him at the close of the first sale. Maurice was not present at either of these two sales (in which Williams sold two and three ounces of crack to Engram for $1,800 and $2,500, respectively); indeed, Agent Engram testified that he never spoke to Maurice about these sales, and that he specifically avoided involving Maurice at all in order to make the case against Williams stronger and because of the physical dangers to undercover agents posed by the use of informants.

Williams did not contest that he sold drugs to Engram; instead, his defense from the outset was that he was induced through threat of bodily harm to him and his family by Maurice, an agent of the government. According to Williams' testimony, the day before the first sale, Maurice—whom he had seen before but whose last name he did not know—asked Williams to deliver a package for him. When Williams balked, Maurice threatened him, and, afraid that Maurice would "probably shoot [him] or something," Williams agreed to deliver the package, which he suspected contained drugs. The next day, Williams delivered the package to Agent Engram, and gave another individual the money he received from the sale.

As to the second and third sales, Williams testified that although he was contacted for each by Engram directly, he engaged in dis-

cussions so that Maurice would believe he was continuing to cooperate. After Williams' initial conversations with Engram, Maurice would then call Williams, directing him to sell to Engram and instructing him as to location and price. According to Williams, he received only $50 for his participation in the three sales, and he did not go to the police out of fear that Maurice would harm him or his parents.

The government sought to rebut Williams' defense. It introduced transcripts of the various conversations between Williams and Engram, which, according to the government, demonstrated that Williams was speaking in a code typically used by drug dealers, thereby suggesting predisposition. On Williams' cross-examination, the government brought out that he made cash payments on three automobiles (a Mercedes, a Lexus ES 300, and a Lexus LS 400) and a motorcycle in the 13–month period directly preceding the drug sales, and admitted to paying $2,800 cash on his cellular phone bill during the month of the sales, actions presumably typical of drug dealers. Williams claimed to have worked as a mover, making $1,200 a month after taxes, but admitted on cross-examination that he never filed taxes on this income. Neither party called Maurice as a witness.

## II.

As Williams correctly asserts, because he admitted to having sold the drugs, the only real issue at trial was his defense of entrapment. This defense "requires a showing that a defendant was induced by the government to commit a crime for which he lacked any predisposition." *United States v. Budd,* 23 F.3d 442, 445 (D.C.Cir.1994) (citation omitted), *cert. denied,* 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995). Once the defendant has come forward with evidence of

inducement[1]—government behavior that would cause "an unpredisposed person to commit a crime," *United States v. Kelly,* 748 F.2d 691, 697 (D.C.Cir.1984)—the ultimate burden of persuasion shifts to the government to prove "beyond a reasonable doubt that the defendant was predisposed to commit the crime." *Budd,* 23 F.3d at 445. Since Williams testified that he was induced, even coerced, by Maurice, the government had reason to introduce evidence either to rebut appellant's claim of inducement or to prove predisposition.

Of course, the most obvious manner in which the government could challenge appellant's story was to call Maurice as a rebuttal witness, which it did not. Instead, the government sought unsuccessfully to introduce through Agent Engram's testimony Maurice's hearsay statements to the effect that Williams and Fats, another drug dealer, worked together. Appellant accordingly requested that the court give the jury what is called the missing witness instruction, allowing the jury to infer that Maurice's testimony would have been unfavorable to the government. We have held that a missing witness instruction is appropriate if (1) "a party has it peculiarly within his power to produce [a witness]"; and (2) the witness' "testimony would elucidate the transaction." *United States v. Glenn,* 64 F.3d 706, 709 (D.C.Cir. 1995) (internal quotation marks and citations omitted). The district court denied appellant's request on the ground that the "government doesn't have to produce confidential informants unless they participate in the transaction in some way."

The government reiterates that position before us, arguing that Maurice could not have given testimony that would have elucidated the second and third transactions because he was not present. That argument is

---

1. In 1978, we stated that "we do not think that the defendant should bear the burden of proving inducement by a preponderance of the evidence," and that the defendant's burden is "met by convincing the jury that there is *some* evidence of government inducement," *United States v. Burkley,* 591 F.2d 903, 914 (D.C.Cir.1978) (emphasis in original), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979), but we more recently have said that "the jury ... decides

whether the defendant has carried his burden of proving inducement, not just producing evidence of it." *United States v. Whoie,* 925 F.2d 1481, 1483 (D.C.Cir.1991). *See also United States v. Layeni,* 90 F.3d 514, 516–17 (D.C.Cir.1996) (jury decides whether the "defendant meets his burden of proving that the government persuaded him to commit a crime"), *cert. denied,* — U.S. ——, 117 S.Ct. 783, 136 L.Ed.2d 726 (1997).

misdirected; it is even a bit disingenuous. The testimony that Maurice would be expected to give goes not to his observation (or lack thereof) of the drug sales, but rather to whether he had induced appellant to engage in those transactions. That was the only issue in the case, and the government, by seeking to elicit Maurice's hearsay statements, tacitly admitted that his testimony was relevant on that issue.

■ There remains the question, however, whether the government had it *peculiarly* within its power to produce Maurice. The government argues that Williams knew Maurice, or had friends who knew Maurice, and, in any event, appellant's counsel never asked the government for Maurice's last name or address. In *United States v. Tarantino*, 846 F.2d 1384, 1404 (D.C.Cir.), *cert. denied*, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988), we held that "no *automatic* inference of exclusive government control arises from the fact that witnesses are acting as government informants," but even if the facts here *were* enough to give rise to an inference of government control—thereby relieving appellant from an obligation to seek a subpoena [2]—we think the district court is entitled to demand more than appellant did here to discover Maurice's whereabouts before agreeing to a missing witness instruction. If defense counsel does not even make some effort to obtain information as to the identity or whereabouts of the "missing witness," it may well be that the defense is no more anxious to call the witness than the prosecution. That would appear to be the case here. Appellant claims only that defense counsel "thought" the government would not disclose Maurice's identity, but defense counsel never actually asked. Under these circumstances, the district court did not abuse its discretion in declining to give the instruction. *Cf. United States v. Beckham*, 968 F.2d 47, 51 n. 3 (D.C.Cir.1992) (In determining whether an alleged error should be "disregarded," FED.

R.CRIM. P. 52(b), we may rely on arguments supporting the district court's decision that it did not rely upon.).

Williams also contends that the district court abused its discretion in failing to grant a mistrial on the basis of a reference to a prior arrest photograph of Williams. On the first day of trial, Agent Engram testified that he obtained a photograph of Williams the day after the first drug transaction. When asked by the prosecutor how the photograph "related to" Williams, Engram responded:

> This is a picture that was in the possession of the Metropolitan Police Department. This is, I guess, a prior arrest photo that was taken by them.

Williams immediately moved for a mistrial; at the bench, the prosecutor explained to the court that Engram had been instructed not to mention that the photograph was from the Metropolitan Police Department, or that it was from a prior arrest. Although the trial judge denied the motion for a mistrial, the judge did offer to tell the jury whatever Williams wanted it to hear, and, at Williams' request, the court immediately instructed the jury: "In view of the testimony of the officer, I want to advise you that Mr. Williams has never been convicted of a criminal offense." Williams argues nevertheless that because his predisposition to sell drugs was *the* issue in the case, the reference to a prior arrest photograph, from which the jury might infer that he had been arrested for selling drugs, was particularly prejudicial.

■ The government, for its part, concedes that the testimony was "improper"—as well it should, for we cannot discern, and the government has not offered, any justifiable reason for the *question* about the photograph, let alone the answer.[3] Identification was never an issue in the case (Williams having conceded that he sold drugs to Engram), and even if it were, while on the stand Engram had already identified Williams as the person who had sold him the drugs. The

---

2. We have said that the special relationship between the government and an informant alleviates the need for the defense to seek a witness *by subpoena*. *Burgess v. United States*, 440 F.2d 226, 232 (D.C.Cir.1970) (separate opinion of Fahy, J.); *id.* at 235–36 (Robinson, J., concurring).

3. Of course, evidence of a prior arrest, without more, would not have been admissible as it would not tend to prove predisposition, but at most general criminal propensity.

government instead argues that the prejudicial testimony did not substantially impact the jury's verdict, *see United States v. Eccleston,* 961 F.2d 955, 959 (D.C.Cir.1992), and notes several factors that demonstrate that Engram's remark did not have such an effect.

We agree, albeit somewhat reluctantly because we are troubled by the government's tactics. The officer never linked the prior arrest photo to any drug transaction, and that appellant may have been arrested for something at some time is unlikely to have much impact on a District of Columbia jury. The district court promptly gave a curative instruction in the language requested by appellant, and, of course, we presume that the jury followed the instruction. *Cf. Greer v. Miller,* 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987). To be sure, an instruction that appellant had never been convicted might imply that he had been arrested. Appellant could not very well have requested an instruction that appellant had never been arrested (because it was not true). Still, appellant asked for, and received, the instruction he got. The district judge has wide discretion in determining whether to grant a new trial, *Tarantino,* 846 F.2d at 1413, and we cannot reverse merely because we might have decided otherwise.

Appellant also objects to the prosecutor's implicit accusation that appellant has a bad character. During the cross-examination of Williams, the prosecutor elicited an admission that Williams had never filed taxes and that he had always been paid (by a moving company) under the table. The prosecutor then asked Williams: "So you're willing to do things that are not quite on the up-and-up?" Defense counsel objected, but the court overruled the objection because "a violation of the internal revenue laws is a criminal offense, so she can say that." And again, .

during rebuttal argument, the prosecutor referenced Williams' income, failure to pay taxes, and his equivocation on various issues, then rhetorically asked the jury: "I mean, what kind of person is this?" Defense counsel did not, however, object to this statement. Williams argues that although evidence regarding his income and failure to pay taxes may have been admissible to impeach his testimony about the source of his income, the prosecutor moved beyond impeachment to questions and statements designed to attack his character generally.

The government insists that it was perfectly appropriate to ask Williams about his job and his failure to file taxes, but appears to concede that the ultimate question going to appellant's character was improper ("ill-advised"). It argues, however, that the error, if any, was again harmless because of the length of the cross-examination. As to the prosecutor's remark, the government points out that appellant did not object at the time, and therefore we can review only for plain error. In any event, the government justifies the comment as fair comment on the testimony.

Although the propriety of the question is dubious, we agree that permitting the comment was surely not plain error,[4] *cf. United States v. Dean,* 55 F.3d 640, 665 (D.C.Cir. 1995) (prosecutor's statement that jury can "throw [defendant's testimony] out the window into a garbage pail" did not require new trial), *cert. denied,* —— U.S. ——, 116 S.Ct. 1288, 134 L.Ed.2d 232 (1996), and the question by itself was not prejudicial. The district court instructed the jury that:

> Counsel's arguments, both at the beginning of the trial and at the end of the trial, are not evidence. They just give their best shot, so to speak, for their particular clients, but what they say is not evidence. It is solely their effort at persuading you

---

**4.** Taken in context, the prosecutor's rebuttal remark appears to have been fair comment on appellant's credibility. The statement was made while the prosecutor was referencing Williams' credibility:

> This is the same person that admits he doesn't pay taxes. He doesn't file his income tax returns. That all the money that he says was paid in cash under the table. But, then he's

got some pay stubs. Yet, curiously, when I ask him, well, if we went to the state, would they have any record of this, he said, no, it's all under the table.

> I mean, what kind of a person is this? This is the same person who says I don't drive my car to the [drug] deal because I didn't have tags. When I show him that he does have tags, oh, well, I didn't really mean that.

that the evidence shows what they think it should show.

The prosecutor's question occurred in the midst of a two-day cross-examination, while the remark during rebuttal was only one remark in a 199–line statement. Given the extensive testimony by Williams and the curative instruction, the two statements did not substantially prejudice appellant; the question and remark were at most "minor aberration[s]," *United States v. Monaghan*, 741 F.2d 1434, 1442 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985), in the trial.

Finally, Williams argues that the trial judge improperly questioned him during his testimony. As we noted earlier, the government introduced audiotapes of Williams' various conversations with Engram to demonstrate that Williams was speaking in a code used by drug dealers (purportedly to avoid wiretaps). After the government asked Williams why, if Maurice had coerced him into selling, he did not respond in detail to Engram's remarks, or ever use the words "drugs," "cocaine," or "crack," the trial judge questioned Williams:

> THE COURT: Why don't you ever use "drugs" or speak plainly? Why do you just use codes or words that somebody overhearing can't understand, like "okay" or whatever like that? Why do you do that?
>
> WILLIAMS: Why don't I ever use the word "drugs"?
>
> THE COURT: The actual amount and things like that. Since you aren't in the drug business, why don't you explain plainly what you're selling here.
>
> WILLIAMS: I was just talking back to whatever—responding back to whatever question he was asking me, Your Honor. That's all.

Later, the judge stated that if defense counsel continued to take statements in the audiotapes out of context, the judge would let the prosecutor elicit "all the places where [Williams] was talking in code or talking about meeting again." Appellant contends that, although he did not object to the court's questioning, the court's error was plain because the judge expressed his opinion on an issue central to the question of predisposition: whether Williams was speaking in a code typical of drug dealers. This line of questioning, moreover, was part of "repeated and aggressive" questioning of him by the district court.

We have seen an increasing number of cases in which our trial judges have been overly pointed in questioning witnesses, particularly defendants, *see, e.g., United States v. Donato*, 99 F.3d 426, 438 (D.C.Cir.1996), and this case borders on that category. Still, the judge did not single out Williams for questioning; he extensively questioned Agent Engram as well. The specific "code" question, on the other hand, is quite troublesome for the reasons appellant argues. But there was not an objection, and we do not think any error could be characterized as plain. The disputed question in the context of the lengthy cross-examination may have appeared to the jury as only an effort to clarify appellant's testimony. Given the substantial evidence of predisposition (and the rather flimsy evidence of inducement), we cannot believe that the judge's questioning, though error, " 'might likely have substantially affected the outcome of the trial.' " *United States v. Saro*, 24 F.3d 283, 287 (D.C.Cir. 1994) (quoting *United States v. Blackwell*, 694 F.2d 1325, 1342 (D.C.Cir.1982)).

This is not an easy case; appellant's arguments are powerful. Even in combination, however, we think that the asserted errors were not sufficiently prejudicial, given the jury's obvious rejection of appellant's own testimony, to justify a new trial.