**UNITED STATES of America, Appellee,**

v.

**Warren P. TILGHMAN, Appellant.**

**No. 96–3114.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 5, 1997.

Decided Feb. 3, 1998.

Lisa B. Wright, Assistant Federal Public Defender, Washington, DC, argued the cause for appellant. With her on the briefs was A.J. Kramer, Federal Public Defender, Washington, DC.

Barbara J. Valliere, Assistant U.S. Attorney, Washington, DC, argued the cause for appellee. With her on the brief were Mary Lou Leary, U.S. Attorney, John R. Fisher, and Elizabeth Trosman, Assistant U.S. Attorneys, Washington, DC.

Before: GINSBURG, HENDERSON and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Convicted of lying in order to obtain disability benefits, appellant argues that the trial judge's repeated questioning of him prejudiced the jury and denied him a fair trial. Because the judge's questions could have telegraphed to the jury that he disbelieved appellant, and because appellant's defense in this case rested so heavily on his own personal credibility, we cannot find that the judge's questions were harmless. We therefore reverse and remand for a new trial.

I

After working for the U.S. Department of Agriculture for several years, appellant Warren P. Tilghman went on disability leave due to back injuries. For thirteen years he received disability benefits of approximately $32,000 per year. In 1984, one year after going on disability, he incorporated Tilghman Enterprises Ltd. ("TEL"), through which he bid on federal agency contracts to investigate employment discrimination complaints. TEL's sole employee, Tilghman ran the company out of his home.

To receive disability benefits, Tilghman had to submit Department of Labor Form 1032 each year. That form required him to report salary or payments obtained from self-employment, "employment other than self-employment," the theoretical market "rate of pay" associated with any uncompensated work, and "any [ ] enterprise in which [he] worked, and from which [he] received revenue, even if [the enterprise] operated at a loss." Except for 1991 when he reported $1500 in self-employment earnings, Tilghman always answered "no" to questions asking whether he was employed or self-employed

and wrote "n/a" in response to questions asking how much he earned.

Learning of Tilghman's EEO work, the government conducted an investigation, then indicting him for mail fraud under 18 U.S.C. § 1341; for making false statements to obtain federal employee compensation under 18 U.S.C. § 1920; and for making false statements to a federal agency under 18 U.S.C. § 1001. He was tried on one count of mail fraud and four misdemeanor counts (one each for the years 1991 through 1994) of making false statements on Form 1032.

For his central defense, Tilghman testified that he had no intention of defrauding the government. He told the jury that he honestly believed that he had no obligation to report his EEO investigative work on Form 1032 because TEL operated at a loss, because he never received any salary from his EEO work, and because a DOL employee told him over the telephone that he could earn up to $300 a month without reporting it.

During the first of Tilghman's two days on the stand, the district judge questioned him extensively in the presence of the jury. Defense counsel offered no objection. On the morning of the second day and before trial began, defense counsel moved for a mistrial, arguing that the judge's questioning influenced the jury and deprived Tilghman of a fair trial. The district judge denied the motion and continued to question Tilghman. Defense counsel objected to four questions and renewed his motion for mistrial at the close of the case.

The jury acquitted Tilghman on the mail fraud count and on the two counts charging him with lying on DOL Form 1032 for 1991 and 1992. He was convicted of lying on the forms he submitted for 1993 and 1994. The court sentenced him to fifteen months incarceration and one year of supervised release, ordering him to pay $84,000 in restitution. On appeal, Tilghman argues both that the judge's questioning deprived him of a fair trial and that the amount of loss underlying the sentence and restitution were incorrectly calculated.

## II

Rule 614(b) of the Federal Rules of Evidence expressly permits judges to question witnesses. Judges may do so repeatedly and aggressively to clear up confusion and manage trials or where " 'testimony is inarticulately or reluctantly given.' " *United States v. Norris,* 873 F.2d 1519, 1525–26 (D.C.Cir.1989) (upholding judge's participation in questioning defendant, although perhaps more extensive than it should have been, because it aimed at clarifying evidence) (quoting *United States v. Barbour,* 420 F.2d 1319, 1321 (D.C.Cir.1969)).

District court authority to question witnesses and manage trials, however, has limits. Because juries, not judges, decide whether witnesses are telling the truth, and because judges wield enormous influence over juries, judges may not ask questions that signal their belief or disbelief of witnesses. *United States v. Wyatt,* 442 F.2d 858, 859–61 (D.C.Cir.1971) (court's questioning of defendant and his alibi witnesses damaged defendant's credibility and therefore was reversible error). Because such questions can usurp the jury's factfinding function, cast the judge in the role of advocate, and "breach [ ] the atmosphere of judicial evenhandedness that should pervade the courtroom," they can deprive defendants of fair trials. *Barbour,* 420 F.2d at 1321. Judges must therefore strive to preserve an appearance of impartiality and " 'err on the side of [a]bstention from intervention.' " *Norris,* 873 F.2d at 1526 (alteration in original) (quoting *United States v. Green,* 429 F.2d 754, 760 (D.C.Cir.1970)).

Drawing the line between appropriate and inappropriate judicial questioning of witnesses presents circuit courts with a challenging task. Appellate records often fail to convey nuance and tone. Unlike many federal circuit court judges, moreover, district judges are experts at supervising trials and managing witnesses. We thus scrutinize trial judge exercise of discretion with both deference and "respect appropriately reflective of the inescapable remoteness of appellate review." *Paylor v. United States,* 404 F.2d 1263, 1265 (D.C.Cir.1968). At the same time, because we must ensure that defendants re-

ceive fair trials, we will set aside a conviction if witness management decisions by district judges "affect substantial rights," FED. R.CRIM.P. 52.

In reviewing allegations of improper judicial questioning, we examine each case on its own facts. We have reversed when judicial interrogation "may have damaged the appellant's credibility in the eyes of the jury" or "may have given the jury the impression that the judge doubted the defendant's credibility." *Wyatt,* 442 F.2d at 860, 861. We have sustained judicial questioning where the case was not "close" and the issues addressed by the judge were "peripheral to the main issues in the case." *United States v. Mangum,* 100 F.3d 164, 174 (D.C.Cir.1996).

The parties disagree about the applicable standard of review. The government argues that at least with respect to Tilghman's first day of testimony, we should review the district judge's questions only for plain error because counsel made no objection until the second day. *United States v. Winstead,* 74 F.3d 1313, 1319 (D.C.Cir.1996). Relying on FED.R.EVID. 614(c)—objections to witness interrogation by the court "may be made at the time or at the next available opportunity when the jury is not present"—Tilghman argues that his mistrial motion made first thing on the morning of Day Two constituted a timely objection to Day One's questions. He urges us to review the judge's actions for abuse of discretion and harmless error. *United States v. Lin,* 101 F.3d 760, 769 & n. 2 (D.C.Cir.1996).

Under the circumstances of this case, we need not decide whether the Day Two mistrial motion was sufficiently timely under Rule 614(c) to permit harmless error review of Day One questions. Counsel's objections were timely with respect to all Day Two questions; as the government concedes, moreover, when reviewing Day Two questions we must review the record as a whole, including Day One questions. *See United States v. Williams,* 113 F.3d 243, 248 (D.C.Cir.1997) (troublesome question reviewed in "context" not reversible error); *United States v. Patterson,* 652 F.2d 1046, 1048–49 (D.C.Cir.1981) (judge's "inquisitorial" questions analyzed "prospectively" and "in context of [ ] trial transcript" were proper).

The question before us, then, is whether the judge's Day Two questions, read in the context of the entire trial, amounted to an abuse of discretion and, if so, whether they were harmless. To sustain defendant's conviction, we must "be able to declare [our] belief that [any error] was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We will reverse if there is " 'a reasonable possibility that the [error] complained of might have contributed to the conviction.' " *Id.* (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963)); *see United States v. Saro,* 24 F.3d 283, 287 (D.C.Cir.1994) (reversal required if court "entertains a 'reasonable doubt' about whether error affected the outcome" (quoting *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828)). The burden of demonstrating harmless error rests with the government. *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

## III

With these standards in mind, we examine the district judge's questioning, beginning with the most troublesome questions on Day Two. Central to his defense, Tilghman asserted that DOL employee Julio Mendez told him in a 1984 telephone call that he had no obligation to report earnings of up to $300 per month. While the prosecution questioned Tilghman about this claim, the following colloquy occurred:

THE COURT: You didn't put this on any form, did you?

DEFENDANT: Did I put it on a form? No sir; this was a telephone conversation.

THE COURT: Did this Julio Mendez put it on a form?

DEFENDANT: I don't know, sir.

| | |
|---|---|
| THE COURT: | We just have to take your word for it? |
| DEF. COUNSEL: | Objection, Your Honor. |
| THE COURT: | Over-ruled. Is that right? |
| DEFENDANT: | I'm sworn to tell the truth, sir. |
| THE COURT: | I know, but we have to take your word for it; is that right? |
| DEFENDANT: | I don't know if he has any record of it or not. |

---

5/22 a.m. Tr. at 46. Focusing on the absence of any evidence of this phone call, the prosecutor then questioned Tilghman for several transcript pages.

Earlier that same day, while Tilghman described for the jury his understanding of DOL Form 1032, the judge questioned him as follows:

| | |
|---|---|
| THE COURT: | You were an employee of Tilghman Enterprises? |
| DEFENDANT: | That is correct, sir. |
| THE COURT: | Doesn't that fit in the paragraph Employment other than Self-Employment? Under this heading, you must report all employment. |
| DEFENDANT: | For which you receive wages. |
| DEF. COUNSEL: | Objection, Your Honor. |
| THE COURT: | It goes on to say if you perform work for which you were not paid, you must show a rate of pay of what it would have cost. You didn't put that in any of them? |
| DEFENDANT: | I felt that was not applicable, sir, because there was no way to compute those figures. |
| DEF. COUNSEL: | Your Honor, if I may just renew my objection. |
| THE COURT: | The objection is over-ruled. |
| PROSECUTOR: | In other words, Mr. Tilghman, it is your belief that the Department of Labor had to specifically ask you, Okay, Mr. Tilghman, asterisks, we want to know about your corporation? |
| DEFENDANT: | No. It was my belief that I had to answer carefully, accurately, and honestly; and I did so. |

---

5/22 a.m. Tr. at 40–41.

As in *United States v. Wyatt,* we think these questions "may have given the jury the impression that the judge doubted the defendant's credibility." *Wyatt,* 442 F.2d at 861. The judge's questions could have been particularly damaging because the indictment charged Tilghman with lying, making his

credibility unusually critical to his defense. The jury could have interpreted the Mendez question—"[W]e have to take your word for it; is that right?"—as signaling that the judge considered Tilghman's oath irrelevant and his word suspect. Even the government conceded at oral argument that the judge should not have asked this question, calling it "unfortunate." From the second set of questions, the jury could have inferred that the judge accepted the government's theory of the case that Tilghman should have checked off the "self-employment" box on Form 1032.

Turning to Day One, the judge's questions reinforce our perception that the Day Two questions may have colored the jury's assessment of Tilghman's veracity. For example, as Tilghman explained to the jury how a bank officer had instructed him to fill out a loan application, the following exchange took place:

THE COURT: You're an educated man, aren't you? You have a master's degree, and you did work for a doctorate. Is that right?

DEFENDANT: That's correct, sir.

THE COURT: Now, this is supposed to get a loan from the bank, and you put down as annual income $45,000 and expenditures $14,000. On the basis of that, they were going to give you a loan, right?

DEFENDANT: I would assume so, yes.

THE COURT: And those figures aren't accurate because the chairman of the board told you to put them in.

DEFENDANT: You say they are or are not?

THE COURT: They're not accurate. You say they aren't accurate because he just told you what to put in.

DEFENDANT: In essence, he did tell me what to put in.

THE COURT: Do you think that any sane bank would give somebody a loan on figures that are totally made up? I mean, as an educated man who's been in business off and on, and government business, private business. Do you think [a] bank would give a loan to somebody on the basis of figures that are just made up by the chairman of the board?

---

5/21 p.m. Tr. 84–85.

Later on Day One, Tilghman described the bidding process for EEO investigative contracts, stating that he and other investigators routinely lost money or broke even:

THE COURT: Other people who [bid] in the same ball park with you, and they all must have lost money, too, is that right?

DEFENDANT: I'm assuming so, sir, yes, sir, because [a] lot of them went out of business.

THE COURT: I see. It's a peculiar business where everybody stays in for years and loses money all the time.

DEFENDANT: All I can--the only thing I know to relate it to—

THE COURT: Wouldn't you agree it's a peculiar business?

DEFENDANT: Sir?

THE COURT: Wouldn't you agree it's a peculiar business?

DEFENDANT: Not necessarily. I taught for years, and I could have made much more money doing something else.

---

5/21 p.m. Tr. at 107. A moment later, the judge interjected:

THE COURT: Just a minute. Something occurred to me. You were not in the business of making money out of these contracts. You were perfectly content to lose money on these contracts.

DEFENDANT: I was—

THE COURT: You were a philanthropist; you wanted to help these people.

DEFENDANT: No, I was hoping I could at least break even.

---

5/21 p.m. Tr. at 109.

Like the questions on Day Two, these inquiries could have suggested to the jury that the judge disbelieved Tilghman. From the first set of questions, particularly the judge's reference to "any sane bank," the jury could have inferred that the judge thought Tilghman was lying about the basis of the loan. The judge's reference to philanthropy likewise could have suggested to the jury that he did not believe that Tilghman was losing money, as he testified. Having heard these Day One questions and the judge's Day Two challenge to Tilghman's honesty under oath, the jury could well have concluded that the judge considered Tilghman an untruthful witness.

As the government argues, it is possible that the judge's comments actually "helped appellant bring out his defense." It is also possible that the judge's questioning generated jury sympathy for Tilghman. But under the harmless error standard, we cannot speculate about what transpired behind the jury room door. We ask only whether the judge's questions "may have" damaged Tilghman's credibility. *Wyatt,* 442 F.2d at 860. Because the jury could reasonably have interpreted the judge's pointed comments as reflecting his personal disbelief of Tilghman, we cannot find that the government has "prove[n] beyond a reasonable doubt that [the judge's commentary] did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

We think the questions asked in this case were even more inappropriate than the "quite troublesome" query the same district judge posed in *United States v. Williams,* 113 F.3d at 248. There, he asked the defendant why if he was not a drug dealer he used "code" words for drugs in conversations with potential buyers. Although we worried about the "increasing number of cases in which our trial judges have been overly pointed in questioning witnesses, particularly defendants," *id.,* observing that "this case borders on that category," *id.,* we upheld that conviction because "there was not an objection, and we do not think any error could be characterized as plain," *id.* Here, not only did counsel object, but the judge asked several "overly pointed" questions.

This case also differs from *United States v. Mangum,* where "any impact the [judge's] questions might have had on the jury was

insignificant in relation to the overwhelming evidence against [the defendant]." 100 F.3d at 174. This jury acquitted Tilghman of two counts and the government concedes in a post-argument submission that it has no evidentiary basis for distinguishing those two counts from the two on which Tilghman was convicted. To us, the split verdict suggests both jury uncertainty and susceptibility to judicial influence.

The government argues that because the judge also asked intrusive questions of government witnesses and badgered the prosecutor about her handling of exhibits, the jury could have perceived him as evenhanded. The record shows that the district judge did criticize the prosecution's case, implying, for example, that some government witnesses were unclear, confused, or inept. After questioning one government witness, the judge said to the prosecutor, "You better ask the questions. I don't know what she's talking about." 5/13 p.m. Tr. at 70. To other witnesses he made such comments as: "You have never said just 'no' or 'yes.' You always go on and on and make a whole speech," 5/15 Tr. at 41, "Nevermind, nevermind. You are not helping me," 5/15 Tr. at 45, and "Just answer the question.... We don't need an encyclopedia in response to every question." 5/16 p.m. Tr. at 71. He also commented on the prosecution's evidence. When granting a defense objection, for example, he said: "I don't see any relevance whatever. I am surprised nobody has objected before," 5/16 a.m. Tr. at 27, and during the prosecution's examination of a character witness he asked, "Are you finished with this line of questioning?.... Or are you dredging up some more?" 5/20 Tr. at 149–50. In addition, the judge criticized the prosecution's inefficient handling of exhibits. "I want to congratulate you," he said at one point, "[t]his is actually marked with a sticker." 5/15 a.m. Tr. at 52.

Contrary to the government's argument, we think the nature of the judge's treatment of the prosecution differed fundamentally from his questioning of Tilghman. Indeed, comparing the two illustrates the difference between appropriate, active, even aggressive judicial management and prejudicial judicial questioning. As the manager of the proceedings, the district judge had ample authority to discipline government counsel for disorganization or inefficiency. It is one thing to criticize counsel about exhibits; it is quite another to question the defendant's credibility on the stand when the central issue is whether he is telling the truth. The judge's comments on the confusing quality of government testimony could not possibly undermine the prosecution's case in the same way that his questioning of Tilghman could have punctured the heart of the defense.

The government argues finally that the judge's instructions to the jury cured any improprieties. Having explained that the jury bears sole responsibility for determining the facts, the district judge instructed the jury as follows:

> And if I say anything about the facts, which normally I don't, you just disregard it because I don't have any responsibility, any obligation on the facts. It's entirely up to you. And if I say something, if I said something in the trial or say something in this closing charge about the facts, you just disregard it because you are [as] much judges on the facts as I am judge on the law. I hope you understand that. And that applies to anything I said in the course of the trial, the questions I may have asked or rulings I may have made, they're all not designed, and you should not take them as being my opinion on the facts because it's your opinion on the facts that counts.

5/22 p.m. Tr. at 74–75. This instruction was too little too late. Although jury instructions can cure certain irregularities, at least under the plain error standard, *Winstead,* 74 F.3d at 1319, we agree with the Second Circuit that where, as here, the trial judge asked questions, objected to by counsel, that could have influenced the jury's assessment of the defendant's veracity, such interference with jury fact-finding cannot be cured by standard jury instructions. *United States v. Filani,* 74 F.3d 378, 386 (2d Cir.1996). We need not consider whether special instructions or other measures might cure such errors, for none was employed here.

Because we reverse defendant's conviction and remand for a new trial, we have no need

to reach the sentencing and restitution issues.

*So ordered.*