# United States Court of Appeals
## For the First Circuit

Nos. 16-2490, 20-1402

UNITED STATES OF AMERICA,
Appellee,

v.

CARLOS RAYMUNDÍ-HERNÁNDEZ,
Defendant, Appellant.

_____

Nos. 17-1081, 20-1405

UNITED STATES OF AMERICA,
Appellee,

v.

ROCKY MARTÍNEZ-NEGRÓN, a/k/a Rocky,
Defendant, Appellant.

_____

Nos. 17-1092, 20-1438

UNITED STATES OF AMERICA,
Appellee,

v.

EDGAR J. COLLAZO-RIVERA,
Defendant, Appellant.

_____

Nos. 17-1314, 18-1076, 18-1528, 20-1385

UNITED STATES OF AMERICA,
Appellee,

v.

JOVANNI VARESTÍN-CRUZ,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Thompson and Kayatta,[*]
Circuit Judges.

Katherine C. Essington, for appellant Raymundí-Hernández.
Manuel E. Moraza-Ortiz, for appellant Martínez-Negrón.
José R. Olmo-Rodríguez, for appellant Collazo-Rivera.
Samantha K. Drake, Assistant Federal Public Defender, with whom Eric Alexander Vos, Federal Public Defender, and Vivianne M. Marrero, Assistant Federal Public Defender, Supervisor, Appeals Section, were on brief, for appellant Varestín-Cruz.
Ross B. Goldman, Criminal Division, Appellate Section, U.S. Department of Justice, with whom Brian A. Benczkowski, Assistant Attorney General, Matthew S. Miner, Deputy Assistant Attorney General, Rosa Emilia Rodríguez-Vélez, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Section, were on brief, for appellee.

December 29, 2020

---

[*]    Judge Torruella heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion in this case.  The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

**PER CURIAM.** Defendants-Appellants Carlos Raymundí-Hernández ("Raymundí"), Rocky Martínez-Negrón ("Martínez"), Edgar Collazo-Rivera ("Collazo"), and Jovanni Varestín-Cruz ("Varestín") were convicted by a jury after an eleven-day trial for their roles in an expansive drug-trafficking conspiracy. On appeal, they assert (sometimes collectively, and sometimes individually) that they were deprived of a fair trial for a multitude of reasons. Their primary unified challenge is that they should be entitled to a new trial because, at various instances throughout the trial, the district court judge interjected during witness testimony in such a manner that signaled an anti-defense bias to the jury and caused the defendants serious prejudice. Martínez and Collazo also dispute the sufficiency of the evidence presented to the jury to support their convictions. And defendants continue a long-running argument about Brady violations.

After careful review, we find the evidence sufficient to support the convictions, but the trial unfair due to repeated, one-sided intercessions by the trial judge. We therefore vacate the convictions and remand for a new trial.

## BACKGROUND

## I. The Conspiracy and the Charges

This case stems from the government's efforts to dismantle an extensive conspiracy to distribute cocaine and heroin in Puerto Rico and other parts of the United States between 2005 and 2010. The targeted drug trafficking organization (the "organization") was allegedly comprised of several subsets, each with its own leader. José Figueroa-Agosto (a/k/a "Junior Cápsula") and Elvin Torres-Estrada ("Torres-Estrada") were two of the prominent kingpins, each with his own faction. Other high-ranking actors included Junior Cápsula's brother, Jorge Luis Figueroa-Agosto ("Figueroa-Agosto"), José Marrero-Martell ("Marrero-Martell"), Diego Pérez-Colón ("Pérez-Colón"), and Ismael Luna-Archeval ("Luna-Archeval").

The organization enlisted more than two dozen individuals into its enterprise. The activities of the organization included transporting drugs and money between the Dominican Republic and Puerto Rico (mostly by boat), storing the drugs and money in Puerto Rico, distributing the drugs in Puerto Rico, shipping the drugs to the continental United States, instituting price controls on the sale of the drugs, laundering the proceeds from drug sales, and providing armed security throughout these operational phases.

-4-

In November 2010, the government indicted Junior Cápsula, Marrero-Martell, Pérez-Colón, Figueroa-Agosto, and over a dozen others on drug conspiracy charges in a separate criminal case. See generally United States v. Figueroa-Agosto, No. 10-cr-00435 (D.P.R. Nov. 15, 2010). The ensuing cooperation of these four named men with law enforcement was instrumental to the government's investigation and dismantling of the remaining branches of the organization and the prosecution of Raymundí, Varestín, Collazo, and Martínez in particular.

On February 9, 2011, a federal grand jury indicted four more of the organization's leadership, including Torres-Estrada, Samuel Negrón-Hernández ("Negrón-Hernández"), Ángel Ayala-Vázquez, and Rafael Santiago-Martínez, on one count of conspiracy to import cocaine and heroin from the Dominican Republic, in violation of 21 U.S.C. §§ 952(a), 963. Subsequently, on September 18, 2013, a federal grand jury indicted twenty-seven other individuals alleged to have participated in the criminal organization, including the defendants in this case, through a superseding indictment that charged them with conspiracy to import at least five kilograms of cocaine and one kilogram of heroin, in violation of 21 U.S.C. §§ 952(a), 963 (Count 1), and conspiracy to possess with intent to distribute the same controlled substances, in violation of 21 U.S.C. § 846 (Count 2). The superseding

-5-

indictment also charged Collazo with conspiracy to commit both money laundering and international money laundering, in violation of 18 U.S.C. § 1956(a) & (h) (Counts 3 and 4), and included several forfeiture allegations. The defendants in this appeal were the only ones who entered pleas of not guilty and took their cases to trial.

## II. The Trial

The defendants stood trial for eleven days, from July 8 to July 22, 2016.

### A. The Cooperating Witnesses

The lion's share of the incriminating evidence that the government put to the jury came from three cooperating witnesses: Marrero-Martell, Pérez-Colón, and Figueroa-Agosto. Some of their testimony was corroborated by other witnesses, including law enforcement officers. For the purpose of our review, we briefly introduce these witnesses and the pertinent portions of their testimony.

#### 1. José Marrero-Martell

Marrero-Martell was one of the original members of the drug trafficking organization and a high-ranking member of Junior Cápsula's contingent (at times, his second-in-command).

Marrero-Martell's testimony implicated Collazo, Raymundí, and Varestín. He testified that Collazo transported

drug money to the Dominican Republic on behalf of the organization in his private vessels on at least two occasions in 2009, and that Torres-Estrada had a Porsche, which, according to other testimony, had been purchased for him by Collazo with laundered money. Marrero-Martell also testified that Raymundí was actively involved in collecting, unloading, storing, and distributing drugs for the organization. He placed Raymundí at meetings at the home of one of Torres-Estrada's men, which Varestín also attended on one occasion. Marrero-Martell testified that both Varestín and Raymundí provided security for Torres-Estrada and that he always saw them carrying weapons. According to Marrero-Martell, Varestín and Raymundí were remunerated for providing security, sometimes with drugs.

The organization allegedly had on its payroll a police officer in the Dominican Republic named Colonel Amado González ("Colonel González"). Marrero-Martell testified that in December 2009 he traveled to the Dominican Republic as part of a group (which he claimed included Varestín) sent by Junior Cápsula and Torres-Estrada to murder Colonel González to ensure that he could not identify them if he cooperated with law enforcement.[1]

_____

[1] The Government explained that Dominican authorities detained the group before they could effectuate their plan to kill Colonel González. According to the Government, Colonel González was ultimately killed "by the order of Junior [Cápsula]," albeit

The defense implemented several strategies to impeach Marrero-Martell. They first developed the extent of his cooperation with the government and the benefits he received in return. To receive a tangible sentencing benefit, and after signing a proffer letter, Marrero-Martell participated in over fifty meetings with law enforcement personnel and he testified in several trials and grand jury proceedings in drug trafficking cases. Pursuant to his plea and cooperation agreements, in exchange for his assistance, the government recommended a significantly lower sentence (105 months' imprisonment) than Marrero-Martell would have faced given the actual quantity of drugs he was charged with trafficking (his guideline sentencing range was 210 to 262 months' imprisonment). On August 29, 2014, he was sentenced to 72 months' imprisonment.

Varestín also sought to impugn Marrero-Martell's credibility by drawing out potential ulterior motives for the testimony Marrero-Martell provided. One such theory was that the drug trafficking organization was divided into competing factions, namely between Junior Cápsula (with whom Marrero-Martell was aligned) and Torres-Estrada (with whom Varestín and Raymundí were aligned). Notably, Torres-Estrada had allegedly tried to kill

---

on a separate occasion and by a different group.

Marrero-Martell. Marrero-Martell testified that at various points between his incarceration in 2010 and his release in February 2014, he was jailed in the same facility and/or unit as Junior Cápsula and Pérez-Colón. Marrero-Martell also testified that they communicated by cell phone when jailed in separate units of the same facility. This fit into the defense's larger narrative that Marrero-Martell and the other cooperating witnesses had coordinated their testimony to deliver a blow to Torres-Estrada's faction, although Marrero-Martell denied ever being asked to lie or offered money to testify against Torres-Estrada's organization.

## 2. Diego Pérez-Colón

Pérez-Colón participated in the organization's drug trafficking activities and assumed a managerial role in the transportation, distribution, and accounting side of its operations from 2005 to 2010. According to his testimony, he was part of Junior Cápsula's faction. Pérez-Colón's testimony implicated all four defendants. He testified that he worked with Varestín and knew him well. He also placed Varestín on the December 2009 trip to kill Colonel González. Pérez-Colón described Varestín and Raymundí as "trigger men," who would provide an armed escort to Pérez-Colón when receiving and moving drugs. Pérez-Colón testified that he had worked with Raymundí since early 2009 to receive and distribute drugs. According to his testimony,

Pérez-Colón would hold Junior Cápsula's drugs and Raymundí would hold Torres-Estrada's drugs, as Raymundí was one of the high-ranking members of Torres-Estrada's outfit. Pérez-Colón also linked Raymundí to the weapons provided to "boat captains" for transport to the Dominican Republic to be used in the plan "to kill [Colonel] Amado González." Pérez-Colón testified that he supplied Collazo with drug money for transportation to the Dominican Republic at least three times. Finally, Pérez-Colón stated that Martínez was an employee of Luna-Archeval, a major drug distributor in Puerto Rico, and that Pérez-Colón exchanged drugs and money with Martínez on more than seven occasions.

Pérez-Colón also testified about the names of individuals in his drug ledger. Specifically, he testified that one of the individuals listed in the ledger was named "Bocky," who the ledger indicated had been supplied with five kilos of cocaine. On cross-examination, Pérez-Colón confirmed that "Bocky" was a "totally different person from [defendant] Rocky Martínez."

As with Marrero-Martell, the defense's trial strategy revolved around impeaching Pérez-Colón's credibility. The defense drew out information about the details of Pérez-Colón's cooperation with the government. Like Marrero-Martell, Pérez-Colón entered into plea and cooperation agreements with the government in the hopes that it would lead to a "reduction of [his]

sentence." To that end, Pérez-Colón participated in many interviews with law enforcement personnel and testified in several grand jury proceedings and trials. Pérez-Colón stated that he also discussed his decision to cooperate with Junior Cápsula, Marrero-Martell, and Figueroa-Agosto (his co-defendants). Ultimately, on January 22, 2016, Pérez-Colón was sentenced to 97 months' imprisonment, which was also the amount of time recommended by the government (his lowest guidelines sentencing range was 168 to 210 months' imprisonment).

In furtherance of this impeachment strategy, the defendants drew out testimony that Pérez-Colón had indeed communicated with Marrero-Martell and Junior Cápsula using illegal cell phones while in jail to discuss the prospect of cooperating with the government. Additionally, the jury heard testimony that Pérez-Colón used weapons, bribed officials, and killed people -- all crimes for which he was never charged. The defense elicited testimony that Pérez-Colón belonged to Junior Cápsula's outfit, and that Junior Cápsula was a father figure to Pérez-Colón -- implying that, like Marrero-Martell, Pérez-Colón was incentivized to lie and to testify against members of Torres-Estrada's contingent. Moreover, Torres-Estrada's employees had kidnapped Pérez-Colón after he was blamed for a lost quantity of cocaine, which Pérez-Colón admitted caused him to fear for his

life.  Martínez also cast doubt on Pérez-Colón's testimony by noting that he did not remember the identities of the people who lived at Martínez's house despite testifying that he conducted several drug transactions there.

### 3.  Jorge Luis Figueroa-Agosto

Figueroa-Agosto participated in the organization's trafficking operations under the command of his brother, Junior Cápsula, from sometime in 2005 until February 2008.  During his tenure, Figueroa-Agosto was in charge of holding and accounting for the proceeds from drug sales and storing drugs in Puerto Rico, as well as sending the money back to the Dominican Republic. Figueroa-Agosto directly implicated Martínez.  He testified that, upon arrival in Puerto Rico, portions of cocaine shipments were delivered to Martínez's boss, Luna-Archeval, and that Martínez would pick up the cocaine and store it in his house.

Figueroa-Agosto explained that he quit the business when he began fearing that other members of the organization, including Torres-Estrada, were going to rob him or kill him.  Like Marrero-Martell and Pérez-Colón, Figueroa-Agosto entered into plea and cooperation agreements with the government.  Figueroa-Agosto testified that he initially suggested the idea of cooperation to his brother, which the defense latched onto on cross-examination in furtherance of their theory that the cooperating witnesses'

testimony was not credible. Figueroa-Agosto expected a sentencing reduction in exchange for his testimony in this case. Figueroa-Agosto was ultimately sentenced in August 2016, about four years after he first entered into the cooperation agreement and one month after he testified at trial in this action. At sentencing, his Guidelines range was 188 to 235 months' imprisonment and the government recommended a sentence of 107 months' imprisonment. The district court made a downward departure and sentenced Figueroa-Agosto to 87 months' imprisonment.

## B.  The Key Defense Witnesses

The defense called several witnesses of its own, some of whom we introduce briefly. To illustrate its theory that the cooperating witnesses were incentivized to lie, Varestín called Jayson Dávila-Reyes ("Dávila-Reyes"), who testified that Pérez-Colón approached him in prison and offered him money in exchange for information against Torres-Estrada or any members of his organization. David Rivera-Rivera ("Rivera-Rivera") was another key defense witness, who Varestín put on the stand to testify that, among other things, the December 2009 trip to the Dominican Republican was actually just a vacation, not a planned attempt to murder Colonel González. The defense also sought to call two law enforcement officers who interviewed the cooperating witnesses on several occasions -- Homeland Security Investigation ("HSI")

Special Agent Carrasquillo ("Agent Carrasquillo") and FBI Special Agent Mario Rentería ("Agent Rentería") -- to establish that the witnesses had added new details to their stories and were therefore unreliable. However, the district court only permitted Agent Rentería to testify.

## C. The Jury Verdict

On July 22, 2016, the jury found the defendants guilty of various offenses. As to the charge of conspiracy to import controlled substances in violation of 21 U.S.C. §§ 952, 963 (Count 1), the jury convicted Raymundí but acquitted the remaining three defendants. As to the charge of conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 (Count 2), the jury convicted all four defendants. Additionally, the jury found Collazo guilty of conspiracy to commit both money laundering and international money laundering in violation of 18 U.S.C. § 1956 (Counts 3 and 4).

## III. The Post-Trial Motions

Soon after the verdict, the defendants filed assorted motions under Rules 29 and 33 of the Federal Rules of Criminal Procedure, seeking judgments of acquittal or, in the alternative, a new trial.[2] In their Rule 29 motions, the defendants asserted

---

[2] Collazo sought only a judgment of acquittal under Rule 29. Martínez, Raymundí, and Varestín sought judgments of acquittal or,

-14-

that the evidence put to the jury was insufficient to sustain their convictions. Their Rule 33 motions submitted that various errors had occurred before and during trial, which required the district court to grant a new trial in the interest of fairness. Many of the grounds they offered for retrial were recycled from contemporaneous objections made during trial. On May 23, 2017, the district court entered an omnibus order denying the defendants' motions across the board. The case then proceeded to sentencing.

## IV. Sentencing and Appeals

Raymundí was sentenced to 180 months' imprisonment on November 18, 2016. Martínez and Collazo were sentenced to 120 months' and 97 months' imprisonment, respectively, on December 22, 2016. Varestín was sentenced to 235 months' imprisonment on March 14, 2017. All four defendants timely appealed.

## DISCUSSION

On appeal, Martínez and Collazo once again assert that the evidence put to the jury was insufficient to sustain their convictions. Additionally, the defendants allege (sometimes together, sometimes separately) a kaleidoscope of errors leading up to and during their trial, including faulty voir dire, an

---

in the alternative, a new trial, under Rules 29 and 33.

-15-

improperly quashed witness subpoena, judicial misconduct, prosecutorial misconduct, and the wrongful suppression of impeachment evidence.[3] The defendants contend that they are entitled to a new trial -- and, in Varestín's case, if not a new trial, at least a new sentence. We first address the sufficiency of the evidence challenges, followed by the defendants' arguments

---

[3] A quick note on adoption of arguments. In his opening brief, Collazo "adopt[s] by reference and join[s] in the arguments made by [his] codefendant[s] . . . in their respective appeal briefs which may also be relevant to [him], particularly about the Brady and Giglio violations, jury selection error, exclusion of the testimony of agent Carrasquillo, and the various requests for mistrial." Martínez, for his part, filed a motion to join and adopt all of Varestín's appellate arguments that may be applicable to him. "[I]n a case involving more than one appellant or appellee, including consolidated cases, any number of appellants or appellees may join in a brief, and any party may adopt by reference a part of another's brief." Fed. R. App. P. 28(i). Of course, the caveat is that the adopted arguments must be "readily transferrable from the proponent's case to the adopter's case." United States v. David, 940 F.2d 722, 737 (1st Cir. 1991). Given the nature of this case, in which the defendants stood trial together for crimes relating to the same drug conspiracy, and where the principal evidence against them derived from the testimony of the same cooperating witnesses, their fair trial arguments are for the most part readily transferable. See United States v. Ayala-Vázquez, 751 F.3d 1, 19 (1st Cir. 2014) (finding adoption of a co-defendant's judicial misconduct claims proper where both defendants were tried for their involvement in the same drug conspiracy).

about judicial interventions, and lastly their contentions about Brady and Giglio errors.

## I. Sufficiency of the Evidence

Our first step is to address whether the government adduced evidence sufficient to sustain Martínez and Collazo's convictions (they are the only two defendants who assert this challenge on appeal). We proceed in this order because "a successful sufficiency challenge" would both require us to vacate their convictions and bar retrial for the same offenses under the Double Jeopardy Clause of the Fifth Amendment (thus also rendering moot their remaining claims of trial error). United States v. Ramírez-Rivera, 800 F.3d 1, 16 (1st Cir. 2015), abrogated on other grounds by United States v. Leoner-Aguirre, 939 F.3d 310, 317 (1st Cir. 2019).

As to Martínez, the district court found that the evidence supported the conclusion that Martínez was involved in aspects of the drug inventory, including storage and distribution. As to Collazo, the district court found that the evidence supported the conclusion that he delivered millions of dollars in drug money to the Dominican Republic using his boat, that he purchased a car for a leader of the drug cartel using illicit funds, and that he intended to join in the drug trafficking conspiracy.

We review de novo the denial of a Rule 29 motion for judgment of acquittal based on insufficient evidence. See United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009). In our review, "[w]e consider all the direct and circumstantial evidence in the light most flattering to the government, 'drawing all reasonable inferences consistent with the verdict, and avoiding credibility judgments, to determine whether a rational jury could have found the defendants guilty beyond a reasonable doubt.'" Ramírez-Rivera, 800 F.3d at 16 (quoting United States v. Negrón-Sostre, 790 F.3d 295, 307 (1st Cir. 2015)). While a sufficiency challenge is a "formidable" task for the movant and an "uphill battle," United States v. Rivera-Rodríguez, 617 F.3d 581, 596 (1st Cir. 2010) (quoting United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008)), it is in no way an "empty ritual," id. (quoting United States v. de la Cruz-Paulino, 61 F.3d 986, 999 n.11 (1st Cir. 1995)); see also United States v. Brandao, 539 F.3d 44, 50 (1st Cir. 2008) ("[W]e will reverse only if the verdict is irrational.").

## A. Martínez's Sufficiency Challenge

Martínez contends that his conviction for conspiracy to possess with the intent to distribute controlled substances in violation of 21 U.S.C. § 846 (Count 2) should be overturned because the evidence was insufficient to establish that he knew the boxes

he handled contained drugs (as opposed to some other item or contraband), and therefore he could not have knowingly or voluntarily joined the drug distribution conspiracy.

Count 2 alleged the existence of a wholesale drug distribution conspiracy, as part of which, the defendants "would store and protect the narcotics and narcotics proceeds within Puerto Rico," and that "some of the narcotics would be divided among the coconspirators for further distribution." Thus, the relevant question for Martínez's sufficiency challenge is "whether a reasonable jury could conclude that the [g]overnment proved beyond a reasonable doubt each element of the crime: (1) 'a conspiracy existed,' (2) [the defendant] 'had knowledge of the conspiracy' and (3) [he] 'knowingly and voluntarily participated in the conspiracy.'" United States v. Burgos, 703 F.3d 1, 10 (1st Cir. 2012) (quoting United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011)). On appeal, Martínez only challenges the second and third elements.

To satisfy the second element, the government must prove "knowledge of the crime charged," id., either in the form of "actual knowledge" or "willful blindness," id. at 11 (citation omitted). It is insufficient to "[s]how[] that the defendant had knowledge of generalized illegality," id. (citing United States v. Pérez-Meléndez, 599 F.3d 31, 43 (1st Cir. 2010)), though the

-19-

government need only establish knowledge that "the conspiracy involved a controlled substance" and not necessarily knowledge of the "specific controlled substance being distributed," id.; cf. McFadden v. United States, 576 U.S. 186, 188-89 (2015) (holding that a conviction under 21 U.S.C. § 841(a)(1) requires knowledge that the defendant is "dealing with 'a controlled substance'" as opposed to "an illegal or regulated substance under some law" in a case involving bath salts, a controlled substance analogue). "[C]harges of conspiracy cannot be made out by piling inference upon inference." Burgos, 703 F.3d at 11 (citing United States v. DeLutis, 722 F.2d 902, 907 (1st Cir. 1983)).

To satisfy the third element, the government must prove that "the defendant both intended to join the conspiracy and intended to effectuate the objects of the conspiracy." Id. (quoting Dellosantos, 649 F.3d at 116). "An agreement to join a conspiracy may be express or tacit," United States v. Santos-Soto, 799 F.3d 49, 57 (1st Cir. 2015) (quoting United States v. Trinidad-Acosta, 773 F.3d 298, 311 (1st Cir. 2014)), and viable evidence may include "inferences 'drawn from members' words and actions and from the interdependence of activities and persons involved,'" id. (quoting United States v. Acosta-Colón, 741 F.3d 179, 190 (1st Cir. 2013)). To be sure, a defendant may be deemed part of a conspiracy even if he only participates in ancillary

functions, such as communications, accounting, or enforcement, as opposed to more central functions like collecting, handling, or selling drugs. See id. at 58.

The gist of Martínez's alleged involvement in the organization is that he worked for Luna-Archeval, a drug distributor who also happened to be in the car parts and mechanic business. According to witness testimony, on behalf of Luna-Archeval, Martínez accepted and stored boxes containing drugs at the auto shop and his own home. Martínez, for his part, asserts that there is insufficient evidence to show that he knew the boxes he handled contained drugs. Specifically, he contends that absent any showing that the boxes were opened in his presence or that any of the witnesses told him that the boxes contained drugs, it was reasonable for him to infer that those boxes contained auto parts (perhaps even stolen auto parts or something else illegal), given the nature of his employment for Luna-Archeval and the fact that auto parts were regularly delivered in boxes to the auto shop. As a result, Martínez maintains, there is insufficient evidence to establish that he was part of the conspiracy.

We find these arguments unpersuasive. Witness credibility aside, the government presented sufficient evidence at trial that would allow a reasonable jury to conclude beyond a reasonable doubt that Martínez knew that the boxes he handled

contained drugs (i.e., that he knew the conspiracy existed) and that he knowingly and voluntarily participated in the conspiracy.

Pérez-Colón and an FBI agent testified that Martínez worked for Luna-Archeval, who was "one of the biggest distributors" in the drug trafficking conspiracy, and to whom Pérez-Colón supplied drug shipments. Pérez-Colón explained that he delivered boxes containing drugs to Martínez, who received them for Luna-Archeval, in exchange for money. The organization's distributors delivered "things" (i.e., drugs and/or money) to Luna-Archeval in boxes because it made sense within the context of Luna-Archeval's business, which received boxes of auto parts. Pérez-Colón also testified that when he ran out of drugs to distribute, he sometimes picked up a new supply of drugs from Martínez's house -- usually cocaine but sometimes heroin. When asked how Martínez "knew that he was dealing with drugs," Pérez-Colón explained, "[b]ecause when I ran out of kilos, I would tell [Figueroa-Agosto], and [Figueroa-Agosto] would call [Luna-Archeval], and then [Luna-Archeval] would call me and tell me to go to his employee's house [i.e., Martínez's house] to pick up the kilos." Pérez-Colón also testified that when he went to Martínez's house, Martínez "would take the kilos out and give them to me. They were cocaine kilos, and once or [on] three occasions there were heroin kilos." Occasionally, Pérez-Colón would give Martínez drug money that "was counted, all

organized, all nice, and it was all tallied up."  All in all, Pérez-Colón testified that he dealt with Martínez upward of seven times and that on some of those occasions, they would exchange a "full tally" of drugs in the range of hundreds of kilos.

All in all, if a rational jury believed this testimony, it could easily find that Martínez knew that the boxes he received, stored, and exchanged for money contained drugs.  The jury could also reasonably conclude based on this evidence that Martínez had a stake in the conspiracy based on his relationship with Luna-Archeval.  See United States v. Azubike, 564 F.3d 59, 65 (1st Cir. 2009) (Azubike II) ("[D]rug organizations do not usually take unnecessary risks by trusting critical transactions to outsiders." (quoting United States v. Azubike, 504 F.3d 30, 37 (1st Cir. 2007) (Azubike I))).  While the evidence may not suggest that Martínez played a leading role in the conspiracy, collecting, storing, and selling drugs are core functions of a drug distribution conspiracy. See Santos-Soto, 799 F.3d at 58.  Furthermore, there is sufficient evidence for the jury to conclude beyond a reasonable doubt that he knew his service advanced the principle aims of the conspiracy. See id.

### B. Collazo's Sufficiency Challenge

We now turn to Collazo's challenge that there was insufficient evidence to sustain his convictions for conspiracy to

-23-

possess with intent to distribute controlled substances (Count 2), conspiracy to commit concealment money laundering (Count 3), and conspiracy to commit international money laundering (Count 4).

## 1. Drug Distribution Conspiracy Conviction

As to Count 2, Collazo stood accused of conspiring to transport millions of dollars of drug money to and from the leaders of the organization. He disputes the sufficiency of the evidence undergirding his § 846 conviction on the grounds that it was based entirely on Pérez-Colón and Marrero-Martell's testimony, which was vague, contradictory, and uncorroborated. We disagree.

Marrero-Martell recalled three particular instances of Collazo's involvement with the organization: first, in May 2009, Collazo transported between $1.5 and $2.5 million from Puerto Rico to the Dominican Republic in a forty-foot private fishing vessel for which he was paid a commission; second, in either June or July 2009, Marrero-Martell saw Collazo and others at Torres-Estrada's home in the Dominican Republic where they had dinner; and third, in September 2009, Collazo transported upwards of $1 million to the Dominican Republic shortly after an assassination attempt on Junior Cápsula during which corrupt Dominican authorities stole the kingpin's drug money. The money was in cash and transferred in ziplock bags and plastic bins, which further suggests its illicit nature. Marrero-Martell indicated that approximately

-24-

$900,000 of the money that Collazo delivered in September 2009 was likely intended to pay Junior Cápsula's girlfriend's bond in the Dominican Republic. According to Marrero-Martell, Collazo also transported Negrón-Hernández back to Puerto Rico on the return trip. Marrero-Martell testified that, as was custom, Collazo received an up-front commission (typically eight or ten percent) for this trip as well.

Pérez-Colón testified that he dealt with Collazo at least three times. After the assassination attempt on Junior Cápsula, Pérez-Colón stated that Marrero-Martell escorted him to Collazo's place of business. Pérez-Colón delivered approximately $3 million for Collazo to transport to Junior Cápsula in the Dominican Republic "to solve a lot of things that were happening" (including paying his girlfriend's bond) in the wake of the attempt on Junior Cápsula's life, during which he lost "all of his" drug money. Pérez-Colón stated that the money he delivered to Collazo was "drug proceeds" and that he did not pay Collazo or know how much Collazo would be paid for his services. Pérez-Colón also testified that, on another occasion, he gave Collazo roughly $2 million for delivery to Torres-Estrada in the Dominican Republic. Pérez-Colón always showed Collazo the money before transferring it to Collazo's possession. Pérez-Colón suspected that the reason the organization conscripted Collazo was because

-25-

"he had a good vessel and . . . a good last name," and that it would make a difference if the authorities stopped "Empresas Collazo" (Collazo's enterprises) as opposed to "Diego Pérez-Colón."

Count 2 alleged that it was "a manner and means of the conspiracy that the defendants and their co-conspirators would send bulk shipments of narcotics proceeds to the Dominican Republic," and that they "conceal[ed] and hid[] . . . [the] acts done in furtherance of the conspiracy." Based on the aforementioned testimony, a rational jury could certainly infer that Collazo knew the drug conspiracy existed, and that he voluntarily participated in its activities for personal financial gain by transporting drug proceeds to the Dominican Republic in furtherance of the organization's broader objectives. From the quantity of cash that Collazo allegedly delivered, the number of the trips he allegedly made, and his extensive interactions with members of the drug trafficking organization, the jury could also reasonably infer that Collazo had actual knowledge of the charged conspiracy. Collazo does not seem to dispute that he transported some cash to the Dominican Republic at the request of certain members of the organization, but he contends that it was earmarked for paying the bond of Junior Cápsula's girlfriend. But based on the modus operandi of the organization -- buying drugs in the

Dominican Republic and shipping them to Puerto Rico -- the jury also could have reasonably inferred that at least some of the money Collazo delivered was used in furtherance of the conspiracy's drug trafficking aims, regardless of whether Collazo ferried drugs back to Puerto Rico himself.  After all, drug trafficking organizations do not typically entrust millions of dollars in proceeds from drug sales to a clueless "outsider."  See Azubike II, 564 F.3d at 65.

Collazo focuses much of his argument on highlighting three discrepancies in Marrero-Martell and Pérez-Colón's testimony, which he submits incurably undermine the evidence against him:  first, that Marrero-Martell and Pérez-Colón do not agree as to whether Collazo was paid for the September 2009 trip; second, while Marrero-Martell recalls that Collazo transported a money shipment to the Dominican Republic in May 2009, Pérez-Colón recalls Collazo's involvement in a shipment sometime after September 2009; and third, that while Marrero-Martell recalled Collazo's fishing boat to be forty-feet long, HSI Agent Ricardo Mayoral ("Agent Mayoral") testified that Collazo's vessel was approximately sixty-one feet long.

While the defendants certainly could argue that these inconsistencies undercut the witnesses' testimony, the jury was not required to so find.  As we have held, "[e]vidence does not become legally insufficient merely because of some inconsistencies in

witnesses' testimony." United States v. Ayala-García, 574 F.3d 5, 12 (1st Cir. 2009) (quoting United States v. Rodríguez, 457 F.3d 109, 119 (1st Cir. 2006)). Further, Agent Mayoral testified that he detained a boat with Collazo and others (including Negrón-Hernández) for a border search in September 2009, when the men were on their way back from the Dominican Republic. While some of the men explained that they had been fishing, no fish or fishing equipment was found on the boat. The jury thus at least had enough corroboration to reasonably infer Collazo's knowing participation in the September 2009 shipment beyond a reasonable doubt.

Accordingly, on balance, there is sufficient evidence to sustain Collazo's § 846 conviction.

### 2. Money Laundering Convictions

Next, Collazo argues that Counts 3 and 4 should be overturned because there is insufficient evidence to establish that he knew that the money he used to purchase a luxury car or the money he transported to the Dominican Republic derived from unlawful activity. Again, we disagree.

First, to affirm a conviction for conspiracy to commit concealment money laundering under 18 U.S.C. § 1956(h), we must find that the government presented sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Collazo (1) "knowing that the property involved in a financial transaction

-28-

represents the proceeds of some form of unlawful activity," (2) conspired "to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity," (3) with "know[ledge] that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." United States v. Ayala-Vázquez, 751 F.3d 1, 14-15 (1st Cir. 2014) (alteration in original) (quoting United States v. Cedeño-Perez, 579 F.3d 54, 57 (1st Cir. 2009)).

The "specified unlawful activity" alleged in Count 3 was "the felonious importation, receiving, concealment, buying, selling, or otherwise dealing in controlled substances." Count 3 specifically alleged that Collazo was part of the organization's conspiracy "to conceal and disguise drug trafficking proceeds" by arranging for "bulk shipments" of drug proceeds to the Dominican Republic in "privately owned yachts," depositing drug money in "nominee bank accounts," paying for goods with checks from those accounts to conceal the ownership and source of the money, commingling drug money with legitimate business proceeds, and buying goods while misrepresenting the source of the money used to pay for them.

On balance, Collazo's sufficiency challenge is without merit. In addition to the aforementioned evidence about Collazo's

transportation of millions of dollars in drug proceeds for the organization, there was testimony that, in 2008, Collazo purchased a "very rare" Porsche GT2 for $313,699 in a cash deal. Collazo's taxable income in 2008 was $12,038, which suggests that the lavish car payment was part of a money-laundering scheme. There was testimony that Collazo had several companies, including ECR Transport, Transporte Collazo, and Empresas Collazo. The license and title for the car were registered to ECR Property, which the jury could reasonably infer was also an entity belonging to Collazo. According to the president of the car dealership, Victor Gómez, Collazo paid for the car with a mix of cash and checks from different corporate entities. This included two $100,000 checks drawn from the account of AC Electroamerica, an entity that the organization used to launder drug proceeds by purchasing luxury items such as cars and boats.

Marrero-Martell testified that it was common practice for high-ranking members of the drug trafficking organization, like himself and Torres-Estrada, to put such goods under the names of third parties. Cf. United States v. Martínez-Medina, 279 F.3d 105, 116 (1st Cir. 2002) ("Purchasing large items with drug money through third parties surely supports an inference of intent to conceal."). Most of Torres-Estrada's "things were not under his name." Moreover, Marrero-Martell testified that only four or five

-30-

Electroamerica checks were used for such purchases, and that he knew that Torres-Estrada bought a Porsche GT2 with an Electroamerica check. The president of the car dealership that sold Collazo the Porsche GT2 testified that the company only imported one or two of them that year. He also testified that Collazo did not take delivery of the Porsche GT2. The jury could reasonably infer from this evidence that Collazo knew that he was using drug money to buy the Porsche GT2 in service of obscuring the paper trail for a leader of the drug trafficking organization. Cf. Ayala-Vázquez, 751 F.3d at 15-16 (affirming conviction for conspiracy to commit money laundering "through the acquisition of various vehicles," including luxury cars, where the evidence showed that the defendant "used a 'straw purchaser' to buy and register the[] vehicles in order to conceal the fact that they were bought and paid for with drug money"). Here, the evidence gives rise to the reasonable inference that Collazo was the "straw purchaser."

Moreover, the government adduced testimony that Collazo added the Porsche GT2 to the commercial insurance policy he maintained for his transportation businesses. The evidence also showed that the two money orders used to pay for the Porsche GT2's policy in 2008 were made out by the CEO of the insurance company at the time, who was fishing buddies with Collazo (and who has

since passed).  Additionally, the CEO's secretary, Sandra Rios, testified that around that time, Collazo brought $15,000 in cash (about the value of the policy) to the CEO's offices in a "medium sized brown [paper] bag."  This is textbook concealment in connection with a money laundering conspiracy.  See id. (noting that payments "placed in plastic or paper bags" can "demonstrate[] an intent to conceal (citing United States v. Cedeño-Pérez, 579 F.3d 54, 61 (1st Cir. 2009))).  From this evidence, the jury could reasonably infer that Collazo knowingly laundered drug money by purchasing of the car as well as the insurance policy.

Next, our analysis of the sufficiency of the evidence on Collazo's conviction for conspiracy to commit international money laundering in violation of § 1956(a)(2)(B)(i) and (h) differs only in that it also assesses whether the government has put forth sufficient evidence that Collazo conspired to "transport funds from the United States to [a foreign country]." Cuellar v. United States, 553 U.S. 550, 561 (2008).  Count 4 alleged that Collazo transported approximately $8 million from Puerto Rico to the Dominican Republic in furtherance of the organization's objectives.

As we have noted, there was testimony that around $900,000 of an alleged $2 million transported by Collazo to the Dominican Republic in September 2009 was earmarked to pay Junior

Cápsula's girlfriend's bond. However, that does not establish, as Collazo urges us to find, that he lacked knowledge that the money he transported to the Dominican Republic derived from drug sales. As we concluded with respect to his § 846 challenge, a jury could have reasonably inferred from the whole of the evidence that Collazo knew that the millions of dollars he transported to the Dominican Republic over the course of several trips derived from the unlawful activity of drug trafficking. Therefore, we find that the evidence was indeed sufficient to sustain Collazo's conviction on Count 4 as well.

## II. Comments Made by the Trial Judge

Out of all the issues on appeal, the defendants' primary unified challenge is that they should be entitled to a new trial because, at various crucial points throughout the trial, the district court judge interjected during witness testimony in such a manner that signaled an anti-defense bias to the jury and caused the defendants serious prejudice. The defendants allege that the district court judge "improperly intruded into the questioning of witnesses, simultaneously assuming the role of the prosecutor and manifesting disdain for the defense['s] theory" and thereby subverting the credibility of key defense witnesses. They specifically call into question several aspects of the trial judge's conduct during the testimony of defense witness

Dávila-Reyes.  Varestín and Collazo (plus Martínez by way of adoption) also protest the trial judge's interjection in the testimony of defense witness Rivera-Rivera.[4]

## A. Legal Framework

As part of the basic guarantees of due process, "a trial judge should be fair and impartial in his or her comments during a jury trial."  de la Cruz-Paulino, 61 F.3d at 997 (citation omitted).  Criminal defendants bringing a judicial bias claim can prevail on appeal if they successfully establish that "(1) the court's intervention gave the appearance of bias and (2) the apparent bias seriously prejudiced [them]."  United States v. Rivera-Rodríguez, 761 F.3d 105, 112-13 (1st Cir. 2014) (referring to the second prong as the "serious prejudice" test); see also United States v. Márquez-Pérez, 835 F.3d 153, 158, 161 (1st Cir.

---

[4] Collazo adds a few more fish to the pond too.  He flags the trial judge's questioning of defense witness Eliezer De Jesús, a coworker of Varestín and Rivera-Rivera who offered general testimony as to Varestín's good character, as another instance of misconduct.  He also highlights that during his defense counsel's cross-examination of Agent Mayoral and his closing argument, the trial judge made statements that undermined the counsel's credibility, "basically telling the Jury that the attorney was making things up."  We deem these claims waived for lack of sufficient argumentation.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Even if not waived, we need not reach them here given our ultimate disposition of the judicial misconduct issue in favor of the defendants.

2016); Ayala-Vázquez, 751 F.3d at 24.

We review preserved claims that a trial judge's actions deprived a defendant of a fair trial "for abuse of discretion, the same standard applied to our review of the trial judge's denial of the motion for a mistrial." Ayala-Vázquez, 751 F.3d at 23; see also United States v. Pagán-Ferrer, 736 F.3d 573, 586 (1st Cir. 2013) ("When reviewing the denial of a motion for a mistrial, 'we consider the totality of the circumstances to determine whether the defendant has demonstrated the kind of "clear" prejudice that would render the court's denial of his motion for a mistrial a "manifest abuse of discretion."'" (quoting United States v. Dunbar, 553 F.3d 48, 58 (1st Cir. 2009))). By contrast, we review unpreserved claims for plain error. United States v. Lanza-Vázquez, 799 F.3d 134, 142 (1st Cir. 2015). Defendants carry a higher burden under this standard because they must demonstrate that "(1) an error occurred, (2) the error was obvious, (3) the error affected substantial rights, and (4) the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. LaPlante, 714 F.3d 641, 643 (1st Cir. 2013) (citation and internal quotation marks omitted). However, we have previously noted that the serious prejudice test in a judicial bias claim more or less saddles criminal defendants with a similar burden to the plain error standard. See

-35-

Rivera-Rodríguez, 761 F.3d at 112 & n.7 (noting that although the serious prejudice standard does not "formally incorporate" the fourth prong of plain error, since a serious prejudice finding means the judge's misconduct compromised the fairness of a trial, "the improper conduct necessarily affects the fairness, integrity, or public reputation of judicial proceedings"); see also United States v. Cruz-Feliciano, 786 F.3d 78, 84–85 (1st Cir. 2015) (reinforcing that establishing a burden of "serious prejudice" is "comparable to demonstrating prejudice under plain error review").

Under certain circumstances, a judge's behavior can be "per se misconduct." Márquez-Pérez, 835 F.3d at 158. This happens when judges "exceed their authority" by "testify[ing] as witnesses, or add[ing] to or distort[ing] the evidence." Id. It can also happen when judges "opin[e] to the jury on the credibility of witnesses, the character of the defendant, or the ultimate issue." Id. Defendants must still establish serious prejudice on this theory. Id.

If the judge's actions are not per se misconduct, we assess whether the trial judge abused his or her discretion by demonstrating improper partiality in front of the jury. Id.; see also Ayala-Vázquez, 751 F.3d at 23-24. This assessment by its nature is very case specific. "To determine whether the jury would perceive bias, we often must examine each intervention in the

context of the trial as a whole." Rivera-Rodríguez, 761 F.3d at 111.

The trial judge plays the role of "governor of the trial," not "mere moderator," Quercia v. United States, 289 U.S. 466, 469 (1933), so his or her "active participation" alone "does not create prejudice []or deprive [a criminal defendant] of a fair trial," Deary v. City of Gloucester, 9 F.3d 191, 194 (1st Cir. 1993). To be sure, the trial judge is afforded fairly wide latitude to "question witnesses and to analyze, dissect, explain, summarize, and comment on the evidence." Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997); see also Fed. R. Evid. 614(b) ("The court may examine a witness regardless of who calls the witness."). Trial judges are given leeway to "criticize counsel, and express 'impatience, dissatisfaction, annoyance, and even anger,'" such that "'a stern and short-tempered judge's ordinary efforts at courtroom administration' are not error." Márquez-Pérez, 835 F.3d at 158 (quoting Liteky v. United States, 510 U.S. 540, 555-56 (1994)).

But with great power comes great responsibility. Trial judges cross the line of neutrality if they "misemploy [their] powers," id., by assuming "the role of an advocate or 'otherwise us[ing] [their] judicial powers to advantage or disadvantage a party unfairly,'" Ayala-Vázquez, 751 F.3d at 24 (quoting Logue,

103 F.3d at 1045). Remaining impartial in a justice system built on jury trials is essential to guaranteeing the due process rights of criminal defendants, for the jury may be swayed by a judge's "lightest word or intimation." Starr v. United States, 153 U.S. 614, 626 (1894). Importantly, "the concern with judicial interrogation" is not that the court will "expose[] bad facts, inconsistencies, or weaknesses in the case" by questioning witnesses. Rivera-Rodríguez, 761 F.3d at 113. What is problematic is "giv[ing] jurors the impression that [the court] has an opinion on the correct or desirable outcome of the case," including about the relevance or credibility of a witness, as this effectively usurps the jury's role. Id.

The other half of the bias test is the serious prejudice inquiry. An improper judicial intervention results in serious prejudice when "there is a reasonable probability that, but for the error, the verdict would have been different." Id. at 112. "In analyzing prejudice, our cases regularly weigh three factors: (1) the nature and context of the error, (2) the presence of curative instructions, and (3) the strength of the evidence in support of the judgment." Márquez-Pérez, 835 F.3d at 161. Of additional note, "in cases with multiple judicial interventions, determining the appearance of bias and the prejudicial effect of that bias generally involves a cumulative effect inquiry."

Rivera-Rodríguez, 761 F.3d at 112.

### B. The Court's Interventions

### 1. Testimony of Jayson Dávila-Reyes

The defense's principal trial strategy was to impeach the credibility of cooperating witnesses Pérez-Colón and Marrero-Martell, whose testimony constituted the overwhelming bulk of the potentially incriminating evidence put to the jury. Varestín called Dávila-Reyes in service of this theory. At the time of his testimony, Dávila-Reyes was imprisoned on prior unrelated gun and drug charges. Varestín posited that Dávila-Reyes's testimony was especially trustworthy because, unlike the cooperating witnesses, he was not offered (nor did he expect) a sentencing benefit in exchange for taking the stand. Of particular note, Dávila-Reyes testified that, while imprisoned in the same unit, the government's cooperating witness Pérez-Colón offered him money "[t]o give false information to be used as testimony against other people." Specifically, Dávila-Reyes stated that Pérez-Colón inquired about "whether [Dávila-Reyes] knew of any violent crime committed by [Torres-Estrada] and his gang," including Varestín.[5] Dávila-Reyes recalled that Pérez-Colón implied that he would take what information Dávila-Reyes

_____

[5] Dávila-Reyes also testified that he knew Varestín a little bit and never saw him with a gun or committing a violent act.

could provide and "bulk it up."

Dávila-Reyes explained that Pérez-Colón "wanted to get information" because "[a]pparently, he was really upset at [Torres-Estrada]." Dávila-Reyes recalled that Pérez-Colón said something to the effect that "he wanted to hit [Torres-Estrada] with everything he had," meaning "[his people] were going to be really in trouble." Dávila-Reyes also explained that Pérez-Colón likely approached him in the first place because "[b]ack then [Dávila-Reyes] was having [his own] problems with [Torres-Estrada]." Dávila-Reyes understood that Pérez-Colón's offer was coming from Junior Cápsula. In the end, Dávila-Reyes did not accept the offer.

On cross-examination, the government sought to discredit Dávila-Reyes's plainly relevant attack on the government's case by questioning Dávila-Reyes about his criminal history. In so doing, the government wandered fairly far afield, asking about the origins of his drug supply in relation to his prior drug offenses. Raymundí objected to this line of questioning twice, which the district court denied both times. Then, Varestín also lodged an objection leading to the following interaction with the court before the jury:

> VARESTÍN: Objection, Your Honor. First of all, beyond scope. Second of all, the government is eliciting information that is not relevant to this trial,

Your Honor.

THE COURT: His testimony also is not relevant in this case.

VARESTÍN: Well, Your Honor, we differ, obviously, but I believe his testimony is relevant.

THE COURT: Counsel, he's accepted that he dealt in drugs. The question is, where did you get the drugs? If he says it was his own drugs, does that mean he grew them up in his back yard, or where did he get the drugs? That's the only question.

The government then proceeded to engage with Dávila-Reyes's response that his indictment for his role in a drug conspiracy charged him as "an enforcer," not "a runner." When the government asked Dávila-Reyes to explain what "the enforcer does for the conspiracy," Raymundí and Varestín both lodged objections based on scope and relevance. The court rebuffed Raymundí's attempt to object, noting that Dávila-Reyes was not his witness, and overruled Varestín's objection. Subsequently, as the government exhausted its attack on Dávila-Reyes, the court took over questioning the witness about the nature of his role as an "enforcer":

THE COURT: What would happen if somebody tried to take away the drugs or tried to interfere with the drug point of the people that you are protecting? What would you do? I am not saying about at that time.

-41-

DÁVILA-REYES:    Back then, I am not going to lie to
                 you but --

THE COURT:       What would you do as an enforcer?

DÁVILA-REYES:    Protect the drugs.

THE COURT:       How would you do that?

DÁVILA-REYES:    I would use all the means I have
                 available.  That's why I am paying 14
                 years, Your Honor.  That's why I am
                 paying 14 years.

THE COURT:       I am not asking you that.  I am
                 asking you, what would you do in such
                 circumstances?

DÁVILA-REYES:    Protect the drugs, sir.

THE COURT:       What would you do to protect the
                 drugs?

DÁVILA-REYES:    Grab it and run off with it, and try
                 to see -- keep myself from being
                 hurt, or defend myself, if it came to
                 that.

THE COURT:       If the one that had the drug didn't
                 want to give it to you, what would
                 you do?  If somebody came to take the
                 drug away from him, what would you do
                 as an enforcer?

DÁVILA-REYES:    Well, in order to hold up the person
                 who has the drugs, they would have to
                 hold me up as well because I am the
                 one there protecting the drugs.

THE COURT:       And what would you do to defend
                 yourself?

DÁVILA-REYES:    Well, at that point it would be to
                 defend my life because that person is
                 coming to hurt me.

-42-

THE COURT:        What would you do -- what would you
                  use to defend your life?

DÁVILA-REYES:     To run, to try to fight -- maybe
                  fight the person as a very last, last
                  recourse, maybe, if the person was
                  armed, but I don't know.  I never had
                  that experience, Your Honor.

THE COURT:        Why would you need a gun then if you
                  would start to run away?

DÁVILA-REYES:     That's like -- I don't know.  I used
                  to say it was like part of the
                  uniform.

The court then turned the witness back over to the government.  No

additional objections were raised at this time.

     After a truncated redirect examination, the district

court once again took over the questioning, this time in a direct

critique of the heart of the witness's claim that the government's

witness had solicited fabricated evidence:

THE COURT:        [I]f you did not tell [Pérez-Colón]
                  anything about anything . . . why
                  did you have to make a sworn
                  statement?

DÁVILA-REYES:     . . . I wanted [Torres-Estrada] to
                  know that I didn't have any intention
                  of hurting him, even though we were
                  supposedly enemies . . . .

THE COURT:        But since you did not tell
                  [Pérez-Colón] anything about any
                  criminal activity on the part
                  of . . . Torres-Estrada, then where
                  would [Pérez-Colón] get the
                  information to fabricate a case
                  against [Torres-Estrada]?  It's
                  simple.  If you did not tell

-43-

[Pérez-Colón] anything, as you mentioned before, of the criminal activity of [Torres-Estrada], why did you have to tell him to be careful? What were they fabricating? What were they fabricating?

DÁVILA-REYES: I don't know.

THE COURT: You just mentioned --

DÁVILA-REYES: I didn't say he was fabricating.

THE COURT: You just mentioned they were fabricating.

DÁVILA-REYES: No, I didn't say "fabricating."

THE COURT: And your testimony --

DÁVILA-REYES: He asked me to tell him so that he could pass it on.

THE COURT: And your testimony here was that you never told [Pérez-Colón] anything about [Torres-Estrada].

DÁVILA-REYES: No.

THE COURT: So how could [Pérez-Colón] tell him anything since you did not tell [Pérez-Colón] anything about the criminal acts of [Torres-Estrada]?

DÁVILA-REYES: When he told me that, I as in my cell with another --

THE COURT: Sir, I don't need an explanation from you. I just want you to tell me . . . . What did [Torres-Estrada] have to fear from [Pérez-Colón]?

DÁVILA-REYES: The same thing he was -- that he would hurt him with some other person who would be -- could provide

-44-

                        information.  I saw it as an illegal
                        act.

    THE COURT:          But since [Pérez-Colón] did not have
                        any information from you, then you
                        are supposing that somebody else
                        could give it.

    DÁVILA-REYES:       I didn't really -- I don't really
                        know.  But I simply saw it as an
                        illegal movement, and I gave him a
                        heads-up.

    THE COURT:          So what you are testifying here then
                        is what you perceived or what you
                        thought; not really what happened?

    DÁVILA-REYES:       No, it is what happened, because
                        those words I used were the words he
                        said to me.

    THE COURT:          All right.  But since you did not
                        give him any criminal information
                        about [Torres-Estrada], then you are
                        assuming that somebody else would
                        have given it to harm
                        [Torres-Estrada].

At this point, Varestín objected "to the Court's line of questioning" on the grounds that the court was "outdoing the job for the [g]overnment" by improperly "trying to impeach [the defense's] witness."  The district court responded: "I wanted to clarify for the jury whether what he is saying is what he really saw or did or heard, or something that he is imagining that happened."

        Subsequently, Varestín filed a motion for mistrial based on the trial judge's comment in front of the jury that

                                -45-

Dávila-Reyes's "testimony also is not relevant in this case." The court denied the motion and explained that defense counsel was "the one that raised the issue that his testimony was not relevant to this trial, because the [g]overnment was trying to elicit information through his testimony that was not relevant to the trial, and I just said, yes, his testimony is not relevant in this case . . . ."

Following the court's decision, the other defendants sought to join in Varestín's motion. Raymundí also requested a jury instruction to disregard the court's comment. However, since Dávila-Reyes was Varestín's witness, and Varestín expressed his preference to withhold a specific instruction on the relevancy comment until the jury instructions at the end of trial to avoid bringing more attention to the matter than necessary, the court stated that it would defer to Varestín's preference. Nevertheless, later that day the court told the jury:

> I just want to remind you that as I told you at the beginning of the case, you as jurors are the sole judges of the facts and the credibility of the witnesses. Comments that I may have made and comments by the Court or the attorneys are not considered as evidence, nor [should] my comments or my questions . . . be an indication to you how to view that evidence nor how -- what I think about the evidence.

As promised, the court also addressed the matter in its final instructions to the jury before they began deliberation:

During the course of the trial, I occasionally have asked questions of a witness. Do not assume that I hold any opinion on the matters to which my questions may relate. The Court may ask questions simply to clarify a matter not to help one side of the case or hurt the other. Remember at all times that you as jurors are at liberty to disregard all comments of the Court in arriving at your own findings as to the facts. So anything I may have said during the course of the trial is not evidence also.

At this juncture, the court also instructed the jury on weighing the credibility of cooperating witnesses:

[Marrero-Martell, Pérez-Colón, and Figueroa-Agosto] have provided evidence on their agreements with the government, participated in the crime charged against the defendants, and expect to receive the benefit of a recommendation from the government to receive a lower sentence in exchange for providing information. Some people in this position are entirely truthful when testifying. Still, you should consider the testimony of these individuals with particular caution. They may have had reason to make up the stories or exaggerate what others did because they want to help themselves.[6]

---

[6] The court additionally instructed:

You should also ask yourselves whether there was evidence that a witness testified falsely about an important fact, and ask whether there was evidence that at some other time, a witness said or did something or didn't say or do something that was different from the testimony the witness gave during trial. But keep in mind that a simple mistake doesn't mean that a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

The defendants renewed their challenges to the court's comments about the relevance of Dávila-Reyes's testimony in their post-verdict Rule 33 motions. The district court declined to find that its comments warranted a new trial. Rather, the court, assuming arguendo that the comments were prejudicial given the centrality of Dávila-Reyes's testimony to the defense's trial strategy of impeaching the credibility of the cooperating witnesses, determined that its curative instructions "dispelled" any prejudice. Moreover, the court noted that any error was harmless because "neither D[á]vila[-Reyes'] testimony nor any comment by the court would be enough to overcome the overwhelming evidence of guilt presented against the defendants at trial." That "overwhelming evidence" was the testimony of the government's cooperators, i.e., the testimony that Dávila-Reyes's testimony was aimed at discrediting.

### 2. Testimony of David Rivera-Rivera

Varestín also called his coworker Rivera-Rivera, who works as a refrigeration technician, to testify. Rivera-Rivera was on the December 2009 trip to the Dominican Republic and he testified that, contrary to what Marrero-Martell and Pérez-Colón had stated, the purpose of the trip was to "enjoy [them]selves and get to know Santo Domingo," and generally to "have fun." He also stated that "nothing happened" during the boat trip aside from

-48-

"drinking on the way."  Rivera-Rivera said that he did not see anyone with guns or drugs during the trip or hear anyone talking about illegal acts such as murder.

On redirect examination, Varestín's counsel asked Rivera-Rivera how many beers he drank on the boat trip.  The government objected as beyond the scope, which the court overruled.  Rivera-Rivera then answered, "several beers," which prompted the following exchange:

THE COURT:      Several is what number?

VARESTÍN:       Can you be more specific?

RIVERA-RIVERA:  Around seven or eight beers.

THE COURT:      During the trip?

RIVERA-RIVERA:  During the trip.

THE COURT:      15 hours?

RIVERA-RIVERA:  Well, exactly -- I don't recall the
                exact time it took for the trip, but
                it was during the -- it was during
                the trip.

THE COURT:      You left at 7:00 p.m., Puerto Rico.

RIVERA-RIVERA:  Uh-huh.

THE COURT:      And you got to the Dominican Republic
                around 1:00 or 2:00 in the afternoon
                the next day?

RIVERA-RIVERA:  Yes.

THE COURT:      How many hours is that? You do the
                arithmetic and tell me.

RIVERA-RIVERA: I can't tell you exactly. I don't recall.

THE COURT: Okay. Let's start at 7:00 p.m. until midnight. How many hours?

RIVERA-RIVERA: From 7:00 to 10:00?

THE COURT: You know I didn't say 10:00. You knew I said midnight. How many hours are there?

RIVERA-RIVERA: Five hours.

THE COURT: And from midnight to 7:00 a.m., how many hours are there?

RIVERA-RIVERA: Seven hours.

THE COURT: Plus five the night before are how many?

RIVERA-RIVERA: Plus five of the previous night -- I am lost again.

THE COURT: Well, find yourself. Five the night before. From 7:00 p.m. to midnight, that's five. And from midnight to 7:00 in the morning, how many hours?

RIVERA-RIVERA: Seven.

THE COURT: Plus the five the night before, how many is that?

RIVERA-RIVERA: 12.

THE COURT: And from 7:00 a.m. until noon, how many are there?

RIVERA-RIVERA: Five.

THE COURT: Plus 12 already, how many is that?

RIVERA-RIVERA: 17.

```
THE COURT:        And one more, from noon to 1:00
                  o'clock or 2:00 o'clock, how many
                  more?

RIVERA-RIVERA:    About 18 hours.

THE COURT:        And that's how long the trip took?

RIVERA-RIVERA:    Approximately.    I  don't  recall
                  exactly.

THE COURT:        But approximately 17 hours?

RIVERA-RIVERA:    More or less.

THE COURT:        And you had only seven beers during
                  those 17 hours?

RIVERA-RIVERA:    Around, more or less.  Perhaps one or
                  two more.
```

There were no objections to this inquiry, nor did any of the defendants raise the issue in their post-verdict Rule 33 motions.

## C.  Analysis

Where the Government builds its case against criminal defendants predominantly on cooperating witness testimony, which the jury must weigh against the testimony of key defense witnesses, "the [district] court must take particular care to avoid any appearance that it favors the government's view of the case." Rivera-Rodríguez, 761 F.3d at 120 (citation omitted); see also United States v. Barnhart, 599 F.3d 737, 745 (7th Cir. 2010); United States v. Tilghman, 134 F.3d 414, 416 (D.C. Cir. 1998) ("Because juries, not judges, decide whether witnesses are telling the truth, and because judges wield enormous influence over juries,

-51-

judges may not ask questions that signal their belief or disbelief of witnesses." (citing United States v. Wyatt, 442 F.2d 858, 859-61 (D.C. Cir. 1971)). Here, the government's proof relied heavily -- and in many respects crucially -- upon the testimony of three cooperating witnesses: Marrero-Martell, Pérez-Colón, and Figueroa-Agosto. If the jury did not believe testimony from those cooperating witnesses, the government's case largely fell apart as to the specific crimes charged.

We turn first to the trial judge's comment that Dávila-Reyes's testimony was flat-out "not relevant in this case." To the contrary, Dávila-Reyes's testimony was highly relevant and central to the defense. He directly attacked the credibility of Pérez-Colón by stating that Pérez-Colón was offering money for information that could be "bulk[ed] . . . up" to incriminate the defendants. Earlier testimony had revealed that Pérez-Colón was in touch with the other cooperating witnesses and Junior Cápsula on the subject of cooperating with the government. So Dávila-Reyes's testimony about Pérez-Colón, if believed, undercut more or less the entire prosecution case by suggesting that the cooperators were fabricating testimony to take down a rival faction.

We have previously noted that adding to the evidence by weighing in on witness credibility amounts to "per se misconduct" (i.e., per se appearance of bias), Márquez-Pérez, 835 F.3d at 158;

see also Ayala-Vázquez, 751 F.3d at 27-28, based on the Supreme Court's decision to reverse in Quercia, where the trial judge added to the evidence by expressing his opinion to the jury that the defendant's body language while on the witness stand indicated that he was lying, see 289 U.S. at 471-72. Distorting the evidence is similarly problematic from the standpoint of signaling bias, see Márquez-Pérez, 835 F.3d at 158, especially when the distortion impacts a critical issue such as the reliability of the testimony offered by three cooperating witnesses, which in this case was instrumental to the government's case against the defendants. The trial judge's relevance comment did just that, "put[ting] his own experience, with all the weight that could be attached to it, in the scale against the accused." Quercia, 289 U.S. at 471. The off-hand comment, which did not serve "to assist the jury in reaching the truth," id. at 472, signaled to the jury that they should disregard Dávila-Reyes's crucial and quite relevant defense evidence as not relevant. By undermining Dávila-Reyes's testimony in this manner, the judge's comment also undermined the defense theory that the cooperating witnesses each had a motive to lie.

We could hardly say then that dismissing Dávila-Reyes's testimony as irrelevant to the case did not cause serious prejudice, for there is a "reasonable probability" that the jury would have weighed the evidence differently (and thus reached a

different outcome) had the trial judge not tipped the scales against Dávila-Reyes's testimony. Márquez-Pérez, 835 F.3d at 161. In other words, if the judge had not intervened, the jury may have credited Dávila-Reyes and disbelieved the cooperators.

To be sure, the government did put other witnesses on the stand. Agent González implicated Martínez by naming him as an employee of the known drug distributor, Luna-Archeval. Agent Mayoral testified that he stopped Collazo's boat for a border search on its way back from the Dominican Republic, but there were neither drugs nor money on the boat. The car dealership and insurance company witnesses implicated Collazo in a potential money-laundering scheme through their testimony about his purchase of a Porsche GT2 and an insurance policy for that car. Additionally, multiple federal law enforcement agents testified about interviews they conducted with Pérez-Colón, Marrero-Martell, Varestín, and Rivera-Rivera in the Dominican Republic, which occurred during the trip described in the testimony of the cooperating witnesses as a thwarted attempt to kill Colonel González. During those interviews, the men told law enforcement that the purpose of the trip was pleasure. Thus, the trial narratives of the cooperating witnesses are what effectively connected the dots and filled in the blanks as to the defendants' alleged participation in the drug trafficking conspiracy. For

instance, Agent González's testimony that Martínez worked for Luna-Archeval packs much less of a punch without Pérez-Colón's and Figueroa-Agosto's detailed explanations of how Martínez accepted delivery of and stored the drug inventory. Although the independent evidence about Collazo's sketchy purchase of the Porsche GT2 and insurance policy is certainly enough circumstantial evidence to raise a red flag, it is Marrero-Martell's explanation of the money-laundering scheme and the practice of paying with checks from Electroamerica that truly completes the picture. While law enforcement testimony places Varestín in the Dominican Republic in December 2009 with members of the drug trafficking organization, only the testimony of the cooperating witnesses specifically connects Varestín to the organization's operations. Thus, on balance, the testimony of the cooperating witnesses was the crux of the government's case against the defendants, and for Varestín and Raymundí, provided the lion's share of the potentially incriminating evidence against them.

The trial judge attempted to explain away his relevance comment as actually supporting the defense's objection to a government question regarding where Dávila-Reyes sourced his drugs when he was involved in drug trafficking activities. However, the record paints a different picture. The district court denied both of Raymundí's objections to this line of questioning. Varestín

then lodged a third objection, reiterating the view that the specific information the government was attempting to elicit was not relevant to the trial. Instead of expressly ruling on Varestín's relevancy objection, the trial judge responded that "[Dávila-Reyes's] testimony also is not relevant in this case." In context, the comment reads more like an off-the-cuff opinion about the weight the judge gave to the testimony that Dávila-Reyes had offered rather than a specific evidentiary ruling (the latter being well within the province of the trial judge). Seen in this light, the comment actualized the risk that the jury, which is susceptible to being influenced by the judge's "lightest word or intimation," Starr, 153 U.S. at 626, would be swayed by the judge's view in its determination of whether and to what extent to both weigh and credit Dávila-Reyes's testimony.

Moreover, the trial judge's curative instructions here were "too little too late" because, where the reliability of witness testimony is so strongly implicated (here, that of the cooperating witnesses against that of the defense witnesses), "such interference with jury fact-finding cannot be cured by standard jury instructions." Tilghman, 134 F.3d at 421 (citing United States v. Filani, 74 F.3d 378, 386 (2d Cir. 1996)). The analysis might be different had the judge specifically withdrawn the comment by explaining that he was by no means suggesting that

-56-

the witness's testimony on direct was not relevant to the case, but that is not what transpired here.[7]

All that being said, we need not and do not rest our holding on the single comment about the relevance of Dávila-Reyes's testimony. As we have detailed above, the trial judge's further intercessions consistently reinforced the pro-government message conveyed by the relevant comment. The trial judge "took over the prosecutor's role" with his questioning of Dávila-Reyes after redirect examination. Rivera-Rodríguez, 761 F.3d at 120. The court began with an innocuous question, asking Dávila-Reyes to explain why he needed to make a sworn statement about Pérez-Colón's attempt to recruit him in prison if indeed he did not provide any information that could be leveraged against Torres-Estrada's crew. Dávila-Reyes explained that he did it to protect himself so Torres-Estrada would not think Dávila-Reyes had crossed him. Seeking this type of clarification about the witness's testimony surely falls on the permissible side of the line in terms of assisting the jury, especially because it appears that the defense

---

[7] One might expect the defendants to have requested a better curative instruction recanting the relevancy comment given its prejudicial potential, but the defendants had different ideas about how best to handle the judge's comment. Raymundí sought a specific instruction that the jury disregard the relevance comment. On the other hand, Varestín (who called the witness) did not want to call more attention to the matter and thus preferred to withhold a specific instruction until the end of trial.

caused some initial confusion by mistakenly suggesting that Dávila-Reyes had made a sworn statement in this case, when in fact, the sworn statement pertained to a different case. What followed, however, shows the trial judge crossing a line to impermissibly argue the prosecution's case.

As if cross-examining Dávila-Reyes, the trial judge asked how, if Dávila-Reyes did not provide any information to Pérez-Colón, Pérez-Colón would be able to fabricate a case against Torres-Estrada and his crew. This appears to have been a rhetorical question because the judge commented, "[i]t's simple," before pressing Dávila-Reyes again on why he wanted to give Torres-Estrada a heads-up and nearly demanding that he answer, "What were they fabricating? What were they fabricating?" The court continued this line of questioning for another page of transcript, trying to get Dávila-Reyes to concede that he had no first-hand knowledge of whether or not someone else might have given information to Pérez-Colón. The exchange culminated with a leading question that likely further discredited Dávila-Reyes's testimony in the eyes of the jury: "So what you are testifying here then is what you perceived or what you thought; not what really happened?" Cf. Rivera-Rodríguez, 761 F.3d at 123 ("The court's assumption of the prosecutor's role in questioning the cooperating witnesses, and its use of leading questions to

facilitate the inquiry, undoubtedly made the trial more efficient, but they also created the impression that the court favored the government's version of events."). One might expect the government to impeach a hostile witness this way on cross-examination, but coming from the judge, it "suggest[ed] to the jury that the court itself ha[d] a stake in the jurors' understanding" the witness's testimony a certain way. Rivera-Rodríguez, 761 F.3d at 121; see also id. at 121-22 ("In short, the court's [line of questioning] was a much more effective way to accomplish what the prosecutor was trying to accomplish, and it added to the overall sense that the judge was helping the government make its case."); United States v. Hickman, 592 F.2d 931, 935 (6th Cir. 1979) ("The district judge's brilliant redirect examination would have been entirely proper had it been done by the prosecutor."). In sum, given the centrality of Dávila-Reyes's testimony to the defense's case, the court's intervention compounded the appearance of bias and resulting prejudicial effect created by the earlier comment on the relevance of Dávila-Reyes' testimony and thus similarly could not be cured by boilerplate jury instructions. Compare Rivera-Rodríguez, 761 F.3d at 123 (finding serious prejudice where the judge's interventions in witness testimony "created the impression that the court favored the government's version of events"), with Ayala-Vázquez, 751 F.3d at 24 (finding no prejudice where the

court's comments bore on eliciting relevant, topical information), and Márquez-Pérez, 835 F.3d at 161–62 (finding no prejudice where the court's conduct related to counsel's courtroom behavior and not the merits of the case).  The impact is especially severe here because the judge's intervention took place during the presentation of important testimonial evidence in the defense case regarding the credibility of the cooperating witnesses and their potential motivations to lie.  See Márquez-Pérez, 835 F.3d at 161 ("[M]isconduct during the presentation of critical evidence is more likely to prejudice than that during testimony irrelevant to the defendant." (citations omitted)).

In terms of its cumulative effect, the trial judge's "enforcer" questioning during the government's cross-examination of Dávila-Reyes weighs in favor of the trial judge showing an anti-defense witness (or pro-cooperating witness) bias.  The same goes for the trial judge's subsequent questioning of Rivera-Rivera, which is concerning because it shows that the judge continued playing prosecutor even after the defense specifically objected that the court was "outdoing the job for the Government" with its questioning of Dávila-Reyes.  In any event, because no defense counsel objected contemporaneously, our review is for plain error (although as we have noted, this does not make much of a difference as far as the third and fourth prongs of the test are concerned).

Nevertheless, evaluated for their cumulative effect established by the aforementioned interventions into Dávila-Reyes's testimony, the error is both clear and obvious. See Rivera-Rodríguez, 761 F.3d at 112; cf. Filani, 74 F.3d at 387 ("It is 'clear error for a trial judge to ask questions bearing on the credibility of a defendant-witness prior to the completion of direct examination,'" as well as "[w]hen a judge joins in cross-examination," because it creates a "'tag team' situation," which gives the jury "a powerful [and impermissible] impression that the district court agreed with the government that the defendant was guilty[.]" (quoting United States v. Victoria, 837 F.2d 50, 55 (2d Cir. 1988))).

The "enforcer" questioning leaves a particularly bad taste because after overruling the defense's objection to the government's questions on that subject, the trial judge took over the cross-examination of Dávila-Reyes and asked leading questions about his past willingness to use force to protect his life and his drugs when he worked as an enforcer. Viewed in isolation, the exchange would likely be a permissible effort to "clear up inadvertent witness confusion" about what the role of an enforcer is in a drug operation. Hickman, 592 F.2d at 933. But in the context of the judge's other interactions with Dávila-Reyes, and especially given the length of the exchange, the judge's comments amounted to cross-examination aimed at developing reasons not to

-61-

believe the witness.

Relatedly, the government contends that the fact that the jury acquitted Varestín, Martínez, and Collazo on Count 1 (the drug importation conspiracy charge) "shows that the jurors were able to consider the evidence free from any bias that the court's comments may have betrayed." This logic fails to persuade us. Without overly psychoanalyzing the jury, the acquittals on Count 1 merely signify that there was only enough evidence to sustain a conviction on that count for one of the four defendants.

The optics deteriorate further when we factor in the court's badgering of Rivera-Rivera to come up with an exact number of beers he drank on a boat trip he took seven years earlier and to calculate the exact duration of that boat trip while on the stand. Rivera-Rivera's credibility was crucial to the defendants. He was the only one on the boat trip to the Dominican Republic in December 2009 without ties to the drug trafficking organization. His testimony that the trip was a vacation and that he did not see or hear any criminal activity on the boat called into question the cooperators' testimony that the purpose of the trip was to kill Colonel González. The judge's extended toying with Rivera-Rivera over how long the trip lasted and how many beers he drank was classic cross-examination aimed at discrediting the witness, making "the jury more inclined to believe the government's version

of events." Rivera-Rodríguez, 761 F.3d at 123. Each of these two interventions may not have crossed the line alone, see, e.g., Márquez-Pérez, 835 F.3d at 158 (noting that a trial judge's impatience, annoyance or short temper are not sufficient conditions for a reversal on misconduct), but together they reinforce our perception that the judge's comments created the appearance of bias because they show a pattern of different treatment of the defense witnesses than of the cooperating witnesses. See Tilghman, 134 F.3d at 421.

Importantly, the judge's inquiries were visibly "one-sided." Rivera-Rodríguez, 761 F.3d at 121. In other words, this was not a case in which the district court was even-handed in its aggressive questioning of witnesses both for the defense and the prosecution.

These two additional instances of "intrusive questioning," Filani, 74 F.3d at 387, compounded the prejudice to defendants that we have identified with respect to the judge's relevance comment and his questioning of Dávila-Reyes after the defense's redirect examination. Varestín and Raymundí feel the cumulative effect rather acutely because Rivera-Rivera's testimony created a material discrepancy as to the cooperating witnesses' testimony about the purpose of the December 2009 trip to the Dominican Republic. We thus find that these interventions

-63-

(although not contemporaneously objected to at trial) amount to plain error when considered in the aggregate. The trial judge's perceptible partiality impaired the integrity and fairness of the trial. Given the severity of the prejudice to the defendants vis-à-vis the tipping of the scales in favor of the credibility of the cooperating witnesses, these interventions could not be cured by the standard instructions offered by the trial judge.

To facilitate courtroom administration, we generally afford trial judges "wide discretion to interject questions in order to throw light upon testimony or expedite the pace of a trial." Logue, 103 F.3d at 1045. To that end, because reading signs of bias from the paper record without first-hand knowledge of the atmosphere and tone in the courtroom is a delicate task, the standard of review we deploy for claims of judicial misconduct is a deferential one (and reasonably so). Cognizant of the challenges of managing a complex eleven-day trial, we nevertheless find that, the cumulative effect of the trial judge's comment that Dávila-Reyes's testimony was irrelevant to the case plus the judge's "continued one-sided interventions" (even after objection from defense counsel) created an appearance of anti-defense witness bias. Without the trial judge's prejudicial interventions, "there is a reasonable probability that [the defendants] would not have been convicted." Rivera-Rodríguez, 761

F.3d at 123. Once the judge signaled to the jury his disbelief of (or his indication to disregard the testimony of) the defense witnesses and, by extension, the defense theory, his comments bolstered the government's case and seriously prejudiced the defendants. In doing so, the judge improperly altered the jurors' ability to evaluate competing testimony on their own. See United States v. Meléndez-Rivas, 566 F.3d 41, 50 (1st Cir. 2009). Because this judicial misconduct infringed upon all four defendants' right to a fair trial, we vacate their convictions and remand for a new trial.

### III. Brady Issues

The defendants collectively raise a host of other issues.[8] Because the relief we order due to the trial court's one-

---

[8] Among the various issues raised, Varestín alleges that the jury selection process was inadequate because the district court prevented the defense from exercising challenges for cause, which he claims amounts to a structural error requiring a new trial. Collazo echoes this argument and adds that it was an abuse of discretion specifically not to excuse a particular juror for cause. Additionally, Varestín and Raymundí -- joined by both Martínez and Collazo -- claim that the Government's elicitation of testimony from its cooperating witnesses about the planned murder of Colonel González and the killing of Marrero-Martell's nephew, Menor, violated the district court's pre-trial ruling (reiterated at sidebar) and thus amounted to prejudicial prosecutorial misconduct. Relatedly, Varestín asserts that the court's failure to translate Pérez-Colón's testimony about the death of Menor into English constitutes a reversible violation of the Jones Act, 48 U.S.C. § 864. Martínez adds his own take on prosecutorial misconduct, which is that the Government both engaged in improper questioning of defense witness Esmira Negrón-Irlanda (Martínez's

sided intercessions equals or exceeds the potential relief that could result from our disposition of those other issues, and because the other issues are unlikely to arise again in the same way, we need neither reject nor accept any party's arguments concerning any of these issues. There is one exception: to make clear that a long-running Brady dispute in this case has been put to bed, we consider and reject defendants' appeal as far as it concerns that issue. Our reasoning follows.

## A. Background

Following trial but prior to sentencing, Varestín's counsel (an Assistant Federal Public Defender) was appointed to represent Carlos Ochoa-Rocafort ("Ochoa"), a former prison guard facing an indictment on corruption charges in an entirely separate criminal case. See United States v. Ochoa, No. 17-cr-00065-JAG

mother) on cross-examination and improperly vouched for cooperating witness Pérez-Colón during closing arguments. Raymundí, Martínez, and Collazo also add a challenge based on the cumulative effect of the various trial errors. To his personal list of trial grievances, Collazo adds contentions that the district court wrongly made public the defense's sealed ex parte motion for records of a boat parked in a lot outside Collazo's place of business and that the Government improperly coached a witness. Martínez, for his part, adds that the delayed sentencing of Figueroa-Agosto and Pérez-Colón, as well as a denial of access to daily transcripts, deprived him of a fair trial. Raymundí and Collazo also challenge the quashing of a witness subpoena aimed at showing that an important government witness testified to facts that he had not previously included when interviewed by law enforcement. Finally, Varestín submits that his 235-month sentence was procedurally unreasonable because it was based on a clearly erroneous drug quantity finding.

(D.P.R. Feb. 9, 2017).  Ochoa informed Varestín's counsel that Marrero-Martell, Pérez-Colón, and Junior Cápsula may have assisted the government in its investigation of Ochoa's case.  Prior to sentencing, Varestín requested that the government verify whether Marrero-Martell, Pérez-Colón, or Figueroa-Agosto were working as confidential informants at the time of the defendants' trial and, if they were, whether any such relevant information fell within the government's disclosure obligations.

At Varestín's sentencing hearing on March 14, 2017, his attorney indicated that the government had responded to the attorney's emails about the confidential informant issue but had not meaningfully addressed the request because it was allegedly unable to get an update from the prosecutor who tried the case (who was no longer a full-time employee in the office). Consequently, Varestín asked the district court to order the government to disclose whether Marrero-Martell and Pérez-Colón were indeed confidential informants during Varestín's trial and, if so, to disclose the nature of any agreements in existence.  In response, the government stated that it had still not been able to get in touch with the trial prosecutor but that it believed it had complied with all of its discovery obligations "up until [the] trial date."

On September 14, 2017, Varestín filed a written motion

reiterating the request made at sentencing, which the other three defendants moved to join. In response, on October 12, 2017, the government asserted that the defendants' "'discovery-like' request" lacked "a prima facie showing of relevance, particularly, at this juncture of the criminal matter," and that the defendants' filing of notices of appeal had nevertheless divested the district court of jurisdiction over the matter. Citing to various cases, including Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972), Varestín objected to the government's response by pointing out that its disclosure duty was ongoing and that the defense had established its burden of proof that the government had violated its obligation to disclose specified exculpatory and impeachment material. In Varestín's eyes, the government had failed to disclose potential impeachment evidence despite the defense's persistent requests, and this continuing non-disclosure was prejudicial because it hampered the defense's ability to adequately cross-examine the cooperating witnesses about whether they were also confidential informants in another unrelated case, teeing up what we have described as a classic credibility contest.

The district court denied Varestín's Brady motion, rendering moot the co-defendants' motions to join. Varestín then filed an ex parte motion for reconsideration, as well as a motion

to compel an array of Brady and Giglio materials pertaining to the cooperating witnesses. Martínez moved to join the latter motion. Without explanation, hearing, or in camera review of the undisclosed material, the district court denied the first motion, rendering the second motion moot.

On appeal, Varestín and Collazo (joined by Martínez and Raymundí) argued that the district court abused its discretion in denying their "post-conviction motions concerning the [g]overnment's failure to comply with its affirmative, ongoing duty to disclose exculpatory and impeachment evidence" under Brady and Giglio to such an extent that a new trial was warranted. Citing United States v. Rosario-Peralta, 175 F.3d 48, 55-57 (1st Cir. 1999), the government responded that we should remand the case to the district court (while retaining jurisdiction) to more fully develop the record in the interest of facilitating our review. In light of the parties' briefing on this issue, we ordered a limited remand to a different district court judge to supplement the record on the question of "whether the government violated its disclosure obligations" under Brady or Giglio.

On remand, Varestín (joined by all of his co-defendants) filed a motion that effectively sought three forms of relief. First, the defense requested an evidentiary hearing on their Brady and Giglio claims. Second, the defense asked the court for an

-69-

order compelling the government to confirm whether Marrero-Martell and Pérez-Colón were confidential informants before, during, or after the trial and, if they were, to produce their unredacted confidential informant file detailing any undisclosed benefit or agreement. Third, they asked the court to compel the production of a six-page document containing a list of people against whom Junior Cápsula planned to testify (although he never did testify in this case), which the government presented to the trial judge during an ex parte sidebar but which was never turned over to the defense.

On March 25, 2020, after reviewing the parties' submissions, the district court denied Varestín's motion, rendering moot those of his co-defendants. By the district court's assessment, the defendants simply had not made a sufficient showing on remand to merit a hearing as to whether the government had violated its disclosure obligations. Because "[t]he threshold showing for securing an evidentiary hearing on a Brady claim is lower than the necessary showing for establishing a Brady claim," the court reasoned that the defendants had therefore "also failed to show entitlement to a Brady or Giglio order on the merits." The defendants' timely appeals of the district court's ruling are presently before us through their consolidation with the original appeals.

## B. Analysis

We review the district court's Brady and Giglio rulings for abuse of discretion. United States v. Caro-Muñiz, 406 F.3d 22, 29 (1st Cir. 2005). Likewise, our review of the district court's denial of an evidentiary hearing in the Brady context is for abuse of discretion. See United States v. Connolly, 504 F.3d 206, 220 (1st Cir. 2007).

"A defendant's right to due process is violated when the prosecution suppresses evidence that is both favorable to the accused and material either to guilt or innocence." Moreno-Morales v. United States, 334 F.3d 140, 145 (1st Cir. 2003) (citing Brady, 373 U.S. at 87). The government's disclosure obligations under Brady also extend to evidence that the defense could have used to impeach the prosecution's key witnesses. See id. (citing Giglio, 405 U.S. at 154). This is an independent duty of the prosecution that exists regardless of whether the defendant requests favorable evidence from the government. See Kyles v. Whitley, 514 U.S. 419, 433-34 (1995).

The defendant's burden is to show that the allegedly suppressed evidence is "material," meaning that "its suppression undermines confidence in the outcome of the trial." United States v. Bagley, 473 U.S. 667, 678 (1985). To prevail on a Brady or Giglio claim, the defendant must establish three conditions:

"[t]he evidence at issue must be favorable to the accused, either because it is exculpatory[] or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999); accord United States v. Peake, 874 F.3d 65, 69 (1st Cir. 2017). Unlike in the sufficiency of the evidence test, the prejudice element in this test considers whether in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434; see also Peake, 874 F.3d at 69 (defining a defendant's chances of success in terms of whether there is "'a reasonable probability that, had the evidence been disclosed to the defense' in a timely manner, 'the result of the proceeding would have been different.'" (quoting Connolly, 504 F.3d at 213)). On balance, we assess materiality "collectively, not item by item." Moreno-Morales, 334 F.3d at 146 (citing Kyles, 514 U.S. at 436). When a defendant's challenge is based on newly discovered Brady or Giglio material, he must also establish that it "was unknown or unavailable to him at the time of trial," and that his inability to discover the evidence was not the product of his own "lack of diligence." Peake, 874 F.3d at 69 (quoting United States v. Maldonado-Rivera, 489 F.3d 60, 66 (1st Cir. 2007)).

-72-

In the Brady context, evidentiary hearings "are the exception rather than the rule." Connolly, 504 F.3d at 220. To obtain a hearing, "the defendant must make a sufficient threshold showing that material facts were in doubt or dispute." United States v. Colón-Muñoz, 318 F.3d 348, 358 (1st Cir. 2003) (citation omitted). "When, for example, the motion is 'conclusively refuted . . . by the files and records of the case,' an evidentiary hearing would be supererogatory." Connolly, 504 F.3d at 219-20 (alteration in original) (quoting United States v. Carbone, 880 F.2d 1500, 1502 (1st Cir. 1989)). It is standard practice to resolve motions for evidentiary hearings based on affidavits, even where "disputed matters of fact aris[e] from post-trial motions." Id. at 220.

Based on the district court's "intricate web of findings," Peake, 874 F.3d at 72, we see no abuse of discretion in its decision that the defendants' claim regarding the suppressed material did not merit an evidentiary hearing or an order to compel any further production. Moreover, the information unearthed in the supplementary proceeding below conclusively refutes the claim that the government improperly withheld prejudicial Brady or Giglio material from the defense.

On the limited remand, the government finally cleared the air about the allegedly withheld Brady and Giglio material.

-73-

After reaching out to "all the federal law enforcement agencies that had any contact with anyone involved in this case," the government represented that the cooperating witnesses were "at no time" confidential informants. In support, the government submitted an affidavit from the FBI and statements from HSI and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). The ATF agent stated that an internal database search revealed that none of the cooperating witnesses

> had a signed confidential informant agreement with ATF. One or all of these individuals may have provided information to ATF but were ultimately not utilized by ATF in a manner that would have required them being registered as ATF confidential informants. ATF policy does not require cooperating defendants merely providing information to be registered as such.

The FBI agent's affidavit stated that an internal search revealed no record of any of the cooperating witnesses "ever having been open as a [confidential informant], or having entered into any cooperating agreement directly with the FBI." Nor did any of those men receive any "one-time payments" or "any other financial benefit." Lastly, an HSI agent stated that the department's database of confidential informants did not contain any records of the cooperating witnesses "ever being documented as HSI confidential informants."

In terms of the relevant timeline, the government asserted that the FBI opened its investigation into Ochoa in

August 2016, after the defendants' trial ended. It is clear from the government's response that Marrero-Martell "never had any involvement in the prosecution or investigation of Ochoa." Thus, the government did not withhold any Brady or Giglio material with respect to Marrero-Martell because in addition to not providing any assistance in Ochoa's case, he was not a confidential informant. Pérez-Colón, on the other hand, did cooperate with the FBI in its investigation of Ochoa. According to the government, his involvement dates back to November or December 2016, when Ochoa smuggled several illegal cell phones into the federal prison in Puerto Rico. Pérez-Colón allegedly received one of these phones from Ochoa and gave it to Junior Cápsula. According to the government, "[t]he FBI was aware of this" and confiscated the phones. Pérez-Colón was released from prison on December 12, 2016. Over a period of time from the day of his release until December 27, 2016, Pérez-Colón "made consensual calls to Ochoa as part of the ATF/FBI investigation into Ochoa" and allowed investigators to download all of the data from these conversations from his cellphone. The government provided the FBI's "302 Reports" (the FBI's official interview notes) to verify the nature of Pérez-Colón's assistance. Nevertheless, the government maintains that Pérez-Colón "was never paid any money for this from any law enforcement agency, was not signed up as a confidential

source, and received no benefit for his assistance in the investigation into Ochoa." Instead, it asserts that at this time, Pérez-Colón was merely under "the same cooperation agreement entered into evidence at trial in this case."

As the district court rightly concluded, the defendants' attempts to refute the legitimacy of the government's proffer are little more than speculative hypotheses. Chiefly, the defendants contend that Pérez-Colón's involvement in the investigation of Ochoa must have dated back at least to January 2016, seven months prior to the trial. In support of this theory, they cite a 302 Report of an interview with an unnamed interviewee dated October 28, 2016, in which the writing FBI agent notes that Ochoa discussed smuggling contraband into a New York prison with the interviewee nine months earlier.[9] However, even if Pérez-Colón were the unnamed interviewee, all that the report reflects is his recollection of conversations with Ochoa that predated the government's investigations.

---

[9] The defendants also surmise that the investigation of Ochoa must have begun prior to August 2016 because Pérez-Colón and Ochoa allegedly spoke about the latter's vehicle days before a confidential tip prompted a stop and search of Ochoa's vehicle, which occurred either in July 2015 or July 2016. As proof, they submit an untranslated police report that is erroneously dated from both July 2015 and July 2016. However, this inconclusive document is off-limits because it is untranslated. See Estades-Negroni v. Assocs. Corp. of N. Am., 359 F.3d 1, 2 (1st Cir. 2004).

The defendants suspect that Pérez-Colón must have had a "tacit agreement" with law enforcement that predated their July 2016 trial because otherwise Pérez-Colón would not have assisted by making the December 2016 phone calls. They also speculate that because Ochoa had been on the government's radar for his corrupt conduct since 2012, the government may have "purposefully placed" Ochoa in prison with the cooperating witnesses to give them "the opportunity to gather information and recruit him." These bald assertions go nowhere. And despite the defendants' protestations in reply that the government should have provided a much more bounteous trove of information, the data provided was adequately responsive to the defendants' original request as to whether the cooperating witnesses had been confidential informants for the government before, during, or after trial.

The bottom line is that Pérez-Colón's cooperation with the FBI and ATF's investigation into Ochoa post-dated the defendants' trial. See United States v. Jones, 399 F.3d 640, 647 (6th Cir. 2005) (noting that, where evidence discovered by a party after remand for discovery on the issue of selective prosecution "did not exist at the time of trial, it was not Brady material"); 2 Fed. Prac. & Proc. Crim. § 256 (4th ed.) ("[E]xculpatory evidence must exist at the time of trial to qualify as Brady material."). If Pérez-Colón had not yet assisted with the Ochoa investigation

at the time of the defendants' trial, the government could not have actually or constructively possessed the details of his cooperation, let alone disclosed them to the defense. See United States v. Perdomo, 929 F.2d 967, 970 (3d Cir. 1991) (stating that the prosecution is obligated to produce only evidence that is "actually or constructively in its possession or accessible to it"); cf. Conley v. United Sates, 415 F.3d 183, 187 (1st Cir. 2005) (finding a Brady violation where defendant "learned the [g]overnment failed to disclose impeachment evidence, including [an] FBI memorandum, in its possession prior to trial").

Even assuming that the Ochoa-related materials catalogued by the district court on limited remand both fell within the scope of the government's disclosure obligations and were constructively within its possession, see United States v. Mathur, 624 F.3d 498, 504 (1st Cir. 2010) (citing Strickler, 527 U.S. at 280-81), their non-disclosure would not have been prejudicial to the defendants. In other words, the newly discovered impeachment evidence relating to Pérez-Colón's involvement in the Ochoa investigation would not undermine our confidence in the integrity of the verdict. See Kyles, 514 U.S. at 434. At best, the Ochoa-related evidence would be cumulative impeachment evidence and thus "immaterial under Brady [and Giglio]." Conley, 415 F.3d at 189; see also id. ("Suppressed impeachment evidence, if cumulative of

similar impeachment evidence used at trial . . . is superfluous and therefore has little, if any, probative value." (emphasis in original)). Pérez-Colón received no additional benefit in exchange for his assistance apart from that which he derived from the very same cooperation agreement pursuant to which he testified in the defendants' trial. All three cooperating witnesses testified about the details of their cooperation agreements with the government, which for Pérez-Colón entailed scores of interviews with law enforcement as well as taking the stand in several court proceedings related to drug trafficking prosecutions. By the terms of his cooperation agreement, which includes a general provision committing him to providing information about criminal activity on an ongoing basis, Pérez-Colón's assistance in the Ochoa investigation, without the promise or receipt of any additional benefit, mirrors the impeachment evidence that the defense already put forward through its cross-examination of the witness. Thus, even if the Ochoa-related materials did fall within the government's disclosure obligations, the government would not have subverted confidence in the jury's verdict by withholding them.

The six-page document listing the names of the potential defendants against whom Junior Cápsula might testify adds nothing to the mix in terms of our wholesale assessment of the potential

prejudice caused by the government's suppression of <u>Brady</u> or <u>Giglio</u> material. Even assuming for the sake of argument that the government improperly withheld the six-page document from the defense, the fact remains that Junior Cápsula did not ultimately testify in the trial and thus did not need to be impeached. The defendants suggest that the list of people against whom Junior Cápsula might testify was material to their case because it supported their theory that the cooperating witnesses coordinated their testimony out of loyalty to Junior Cápsula (and at the expense of Torres-Estrada). But the defense had already elicited testimony about the cooperating witnesses' alleged plan and Junior Cápsula's plea and cooperation agreements. So any testimony elicited about the list of people Junior Cápsula might testify against would have been cumulative.[10]

## IV. Conclusion

For the foregoing reasons, we vacate all four defendants' convictions and remand for a new trial consistent with our resolution of this appeal.

**<u>AFFIRMED IN PART, VACATED, AND REMANDED.</u>**

---

[10] Our holding does not prejudge either way whether any of the evidence we assume to have been material in Part III of this opinion should be admitted at any retrial.